YERGY, RESPONDENT, v. HELENA LIGHT & RAILWAY CO.,
ET AL., APPELLANTS.

(No. 2,647.)

(Submitted June 8, 1909.   Decided June 10, 1909.)

[102 Pac. 310.]

*Street Railways—Personal Injuries—Expert Witnesses—Competency—Discretion—Nonsuit—Willful Conduct of Defendant—Instructions—Objections—Exceptions—Review—Earning Capacity—Opinion Evidence—Excessive Damages.*

Expert Witnesses—Competency—Discretion.
  1.  It was within the discretion of the trial judge to say whether a witness called as an expert was competent.

Street Railways—Personal Injuries—Willful Conduct of Defendant—Nonsuit.
  2.  Where the burden of the complaint against a street railway company was that the death of plaintiff's testator, for which damages were sought, was due to the negligence of defendant's employees in managing one of its cars, failure on plaintiff's part to introduce evidence in support of an additional allegation that defendants' conduct was willful did not warrant the granting of a nonsuit.

Nonsuit—Denial—When Error Cured.
  3.  Where defendant, after an adverse ruling on a motion for nonsuit made at the close of plaintiff's case, introduced evidence which cured the defects upon which the motion was based, the error in denying the motion will be deemed to have been waived.

Street Railways—Personal Injuries—Evidence—Last Clear Chance.
  4.  Evidence *held* to have been sufficient to furnish basis for the application of the doctrine of last clear chance.

Theory of Case—Instructions.
  5.  Where a cause is tried upon a certain theory, the losing party cannot on appeal complain of an instruction covering such theory.

Street Railways—Personal Injuries—Instructions—Proper Refusal.
  6.  An action against a street railway company having been tried upon the theory that negligence in the management of its car could properly be predicated upon the failure of its motorman to exercise reasonable care after deceased was discovered in a situation of peril, a requested instruction which would have authorized the jury to find for defendant, regardless of the conduct of the motorman after he discovered deceased in a place of danger, was properly refused.

Same—Willful Conduct of Defendant—Instructions—Proper Refusal.
  7.  A requested instruction that plaintiff could not recover, even though defendant company was negligent in running its car and deceased was in no respect negligent, unless its conduct in managing the car was willful and reckless, was properly refused where the allegation of willfulness and recklessness in the complaint was not of the *gravamen* of the pleading, where no evidence had been introduced in support of it, and where there was evidence sufficient to warrant recovery aside from the question of willfulness and recklessness.

Instructions—Objections—Exceptions—Review.

8. Under section 6746, Revised Codes, the supreme court may not consider an assignment of error based upon the giving or refusal of an instruction unless proper objection to the instruction proposed to be given, was made and exceptions saved to the rulings of the trial court.

Street Railways—Personal Injuries—Earning Capacity—Opinion Evidence.

9. A witness who testified that he had known deceased for twenty years and had himself for thirty-five years conducted a similar business to that carried on by the latter, that he had done a great deal of business with deceased, and that the latter's capacity as a business man was first class, that he was a good mechanic, kept his own books, etc., and that in his judgment his earning capacity prior to his death was $5,000 a year, was qualified to express an opinion as to the value of deceased's services to his business.

Same—Excessive Damages—Jury—Passion and Prejudice.

10. In awarding damages claimed to be excessive, the elements of passion and prejudice will not be presumed to have influenced the minds of the jurors, if the verdict is based on competent testimony, in accordance with instructions of the court, and easily to be arrived at by mathematical calculation.

Same—Excessive Damages—Remission—New Trial.

11. Where the damages awarded are clearly excessive, the supreme as well as the district court has the power to require the plaintiff either to remit a portion of the verdict or submit to a new trial.

Same—Excessive Damages—Reduction.

12. *Held,* that the verdict for $40,000 was excessive, and a new trial ordered unless plaintiff consent to a reduction of the judgment to $15,000.

*Appeal from District Court, Lewis and Clark County; Thos. C. Bach, Judge.*

ACTION by Mary Alice Yergy, executrix of George O. Yergy, deceased, against the Helena Light and Railway Company and Stephen Peterson. Judgment for plaintiff, and defendants appeal. The judgment affirmed on condition that plaintiff remit a portion of the damages awarded, otherwise reversed and new trial granted.

*Messrs. Carpenter, Day & Carpenter,* and *Mr. Wm. Wallace, Jr.,* for Appellants.

Negligence is a relative term and consists in a failure to do something which, under the circumstances of the particular case, it became the duty of the person charged to do. The duty of the operatives of a street railway at a crossing is no greater than the duty of persons intending to cross the tracks, taking into con-

sideration the relative situation of the parties, and the fact that pedestrians and persons driving a vehicle in full possession of their faculties and control of their teams have more freedom of movement than those in control of the car. As each have an equal right to use the street crossing, and cannot exercise the common right to use the crossing at the same moment of time without serious injury to one or both, equal obligation to care rests upon both. Control of a car means a reasonable control under the circumstances, and not an absolute control so that the car may be immediately stopped under all circumstances. (*Skinner* v. *Tacoma etc. Ry. Co.,* 46 Wash. 122, 89 Pac. 489.) The evidence as to what was done to stop the car must be measured by the opportunity to do it, under the circumstances there present. Where the alleged negligence of a servant consists of an omission of duty suddenly and unexpectedly arising, it is incumbent on the plaintiff to show that the circumstances were such that the servant of the defendant had an opportunity to become conscious of the facts giving rise to the duty and a reasonable opportunity to perform it, before the master can be held liable. (*Chicago Union Trac. Co.* v. *Browdy,* 206 Ill. 615, 69 N. E. 570; *Hestonville M. & F. Pass. Ry. Co.* v. *Kelley,* 102 Pa. 115; *Fenton* v. *Second Ave. R. Co.,* 126 N. Y. 625, 26 N. E. 967; *Rack* v. *Chicago City Ry. Co.,* 173 Ill. 289, 50 N. E. 668, 44 L. R. A. 127; *Chicago City Ry. Co.* v. *Strong,* 127 Ill. App. 472; *Citizens' Street Ry. Co.* v. *Carey,* 56 Ind. 396; *Louisville & N. R. Co.* v. *Young,* 153 Ala. 232, 45 South. 239.)

Upon the presentation of the motion for nonsuit it was suggested that the presumption, based upon the instinct of self-preservation, that the deceased was in the exercise of due care, was sufficient to justify the refusal of this motion. However correct this ruling may have been then, the presumption has now been completely overthrown by the positive testimony of witnesses that the deceased did nothing to avoid the injury. (*Rich* v. *Chicago, M. & St. P. Ry. Co.,* 149 Fed. 79, 78 C. C. A. 663; *Woolf* v. *Washington R. & N. Co.,* 37 Wash. 491, 79 Pac. 997.)

Under the pleadings in this case, the plaintiff was required to prove that the injury to the deceased was willful and intentional, and proof of facts from which only negligence, however gross, could be inferred was not sufficient. (2 Abbott's Brief on Pleadings, 1680; *Rideout* v. *Winnebago Trac. Co.,* 123 Wis. 297, 101 N. W. 672, 3 St. Ry. Rep. 943, 69 L. R. A. 601 and note, and especially the conclusions, p. 615; *Holwerson* v. *St. Louis & S. R. Co.,* 157 Mo. 216, 57 S. W. 770, 50 L. R. A. 850; *Markowitz* v. *Metropolitan St. Ry. Co.,* 186 Mo. 350, 85 S. W. 351, 69 L. R. A. 389.)

The doctrine of the "last clear chance" or humanitarian doctrine, as it is sometimes termed, is not a doctrine by itself, but is an element in all cases where contributory negligence is pleaded, as determining whether or not the contributory negligence of the injured party was a proximate or concurring cause of the injury. (See *Smith* v. *Norfolk & S. R. Co.,* 114 N. C. 728, 19 S. E. 863, 923, 25 L. R. A. 287.)

The doctrine has been frequently before the courts in recent years. The whole literature upon the subject is summarized in the notes to be found in 55 L. R. A. 418 *et seq.,* attached to the cases of *Bogan* v. *Carolina Central R. Co.,* 129 N. C. 154, 39 S. E. 808, 55 L. R. A. 418, and *Gahagan* v. *Boston & M. Railroad,* 70 N. H. 441, 50 Atl. 146, 55 L. R. A. 426.

The case of *Dyerson* v. *Union P. R. Co.,* 74 Kan. 528, 87 Pac. 680, 7 L. R. A., n. s., 132, is strongly illustrative of the case at bar. In that case the court holds that where the injured person could have avoided the accident by the exercise of ordinary care on his part, and where his negligence continued up to the very moment that he was hurt, and where reasonable diligence on his part prior to that time would have warned him in time to have avoided the injury, his negligence in failing to observe the threatened danger concurs with the defendant's negligence in failing to observe him in time to have prevented injuring him, the doctrine of "last clear chance" did not apply, and there can be no recovery.

In *Drown* v. *Northern Ohio Trac. Co.*, 76 Ohio St. 234, 118 Am. St. Rep. 844, 81 N. E. 326, 10 L. R. A., n. s., 421, the court held it reversible error to give an instruction identical in terms with our No. 19 requested. (See, also, *Richmond Pass. & Power Co.* v. *Gordon*, 102 Va. 498, 46 S. E. 772; *Vizacchero* v. *Rhode Island Co.*, 26 R. I. 392, 59 Atl. 105, 69 L. R. A. 188; *Brockschmidt* v. *St. Louis & M. R. Co.*, 205 Mo. 435, 103 S. W. 964, 12 L. R. A., n. s., 345; *Anderson* v. *Minneapolis etc. R. Co.*, 103 Minn. 224, 114 N. W. 1123, 14 L. R. A., n. s., 886, note; *Holwerson* v. *St. Louis & S. R. Co.*, supra; *Riedel* v. *Wheeling Traction Co.*, 63 W. Va. 522, 61 S. E. 821.)

A pedestrian, seeing the approach of a car at a negligent rate of speed, cannot take possession of the crossing and expose himself to obvious danger, under the claim of his equal right to the use thereof, and his assumption of a plainly apparent risk in attempting to get across ahead of a car will bar recovery. (*Sego* v. *Southern Pac. Co.*, 137 Cal. 405, 70 Pac. 279; *Everett* v. *Los Angeles Ry. Co.*, 115 Cal. 128, 43 Pac. 210, 46 Pac. 889, 34 L. R. A. 350; *Matteson* v. *Southern Pac. Co.*, 6 Cal. App. 318, 92 Pac. 101.)

The motorman has the right to assume that Yergy would await the passage of the car, until it became apparent that he did not intend to do so. (*Florida etc. Ry. Co.* v. *Williams*, 37 Fla. 406, 20 South. 558; *Elliott* v. *Chicago etc. Ry. Co.*, 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068; *Collins* v. *Burlington etc. Ry. Co.*, 83 Iowa, 346, 49 N. W. 848; *Green* v. *Los Angeles etc. Ry. Co.*, 143 Cal. 31, 101 Am. St. Rep. 68, 76 Pac. 719; Beach on Contributory Negligence, 394; 2 Shearman & Redfield on Negligence, p. 852.)

Upon the question as to whether the car could have been stopped in a shorter distance than it was, a nonexpert is incompetent to express an opinion. (*Boring* v. *Metropolitan R. Co.*, 194 Mo. 541, 92 S. W. 655; *Columbus R. Co.* v. *Connor*, 6 Ohio C. C., n. s., 361.)

Where the profits of the injured one's business do not depend upon his personal skill and services, but arise from the invest-

ment of capital and involve the labor of others, evidence of such profits is not admissible. (*Johnson* v. *Manhattan R. Co.*, 52 Hun, 111, 4 N. Y. Supp. 848; *Silsby* v. *Michigan Car Co.*, 95 Mich. 204, 54 N. W. 761; *Masterton* v. *Mt. Vernon*, 58 N. Y. 391; *McCracken* v. *Traction Co.*, 201 Pa. 384, 50 Atl. 832; *Wallace* v. *Pennsylvania R. Co.*, 195 Pa. 127, 45 Atl. 685, 52 L. R. A. 33, and note; *Blate* v. *Third Ave. R. Co.*, 51 N. Y. Supp. 590; *Bierbach* v. *Goodyear R. Co.*, 54 Wis. 208, 41 Am. Rep. 19, 11 N. W. 514; *Boston & A. R. Co.* v. *O'Reilly*, 158 U. S. 334, 336, 15 Sup. Ct. 830, 39 L. Ed. 1007; *Goodhart* v. *Pennsylvania Ry. Co.*, 177 Pa. 1, 55 Am. St. Rep. 705, 35 Atl. 191; 7 Ency. of Ev. 421.)

*Messrs. H. G. & S. H. McIntire,* and *Mr. Massena Bullard,* for Respondent.

Street railroads are liable for the negligence of its employees in failing to have the car under control at street crossings, thereby causing injury to persons with vehicles, and the question of negligence and contributory negligence is for the jury. (*Hicks* v. *Citizens' R. Co.*, 124 Mo. 115, 27 S. W. 542, 25 L. R. A. 508, note.)

Excessive speed and want of sufficient control of the car by the motorman are shown where the car runs a considerable distance after the happening of the accident, notwithstanding the efforts to stop it. (Thompson on Negligence, Supplement, sec. 1395.) Indirectly, the rate of speed may be shown by evidence as to the space covered after an attempt has been made to stop the car, where evidence is admitted showing how soon cars running at different rates of speed could be stopped. (*Id.*, sec. 1411; see, also, *Cross* v. *California St. Cable Co.*, 102 Cal. 313, 36 Pac. 673; *Bresee* v. *Los Angeles Traction Co.*, 149 Cal. 131, 85 Pac. 152, 5 L. R. A., n. s., 1059; 6 Current Law, p. 1570, and note 87; *Wall* v. *Helena St. Ry. Co.*, 12 Mont. 44, 29 Pac. 721.)

That the motorman is negligent when he fails to exercise reasonable care to discover the presence of persons negligently exposing themselves on the track, see *Harrington* v. *Los Angeles*

*R. Co.,* 140 Cal. 514, 98 Am. St. Rep. 85, 74 Pac. 15, 63 L. R. A. 238; *South Chicago City R. Co.* v. *Kinnare,* 96 Ill. App. 210; *Indianapolis St. R. Co.* v. *Schmidt,* 35 Ind. App. 202, 71 N. E. 663, 72 N. E. 478; *Indianapolis St. R. Co.* v. *Seerley,* 35 Ind. App. 467, 72 N. E. 169; 1034; *Carney* v. *Concord St. R. Co.,* 72 N. H. 364, 57 Atl. 218; *Memphis St. R. Co.* v. *Haynes,* 112 Tenn. 712, 81 S. W. 374; *McDermott* v. *Severe,* 202 U. S. 600, 26 Sup. Ct. 709, 50 L. Ed. 1162.

The deceased was not guilty of contributory negligence prior to or at the time of the collision of the car with his buggy. The rule to ''stop, look and listen'' is not applicable to street railroads. (*Wall* v. *Helena St. R. C.,* 12 Mont. 44, 29 Pac. 721; *Tacoma etc. Power Co.* v. *Hayes,* 110 Fed. 496, 49 C. C. A. 115; *Hays* v. *Tacoma Power Co.,* 106 Fed. 48; *Cincinnati Street Ry. Co.* v. *Whitcomb,* 66 Fed. 915, 14 C. C. A. 183; *Orr* v. *Cedar Rapids etc. Ry. Co.,* 94 Iowa, 423, 62 N. W. 851; *Wolf* v. *City Ry. Co.,* 50 Or. 64, 85 Pac. 620, 91 Pac. 464, 465; 2 Thompson on Negligence, secs. 1441, 1443, 1448, 1452, 1479; *Cross* v. *California S. R. Co.,* 102 Cal. 313, 6 Pac. 673; see, also, *Goff* v. *St. Louis Transit Co.,* 199 Mo. 694, 98 S. W. 49, 9 L. R. A., n. s., 244; *Baker* v. *Wilmington etc. Co.,* 118 N. C. 1015, 24 S. E. 415; *Eckhard* v. *St. Louis T. Co.,* 190 Mo. 593, 89 S. W. 602; *Littlefield* v. *New York City Ry. Co.,* 51 Misc. Rep. 737, 101 N. Y. Supp. 75.)

It is further claimed that because of the use of the words ''willfully and recklessly'' in the complaint, a nonsuit should have been granted. The rule is general that in a complaint charging willfulness, wantonness, gross negligence, etc., a recovery can be had for proof of simple negligence. (*Chicago City Ry. Co.* v. *O'Donnell,* 207 Ill. 478, 69 N. E. 882; *Hays* v. *Gainesville St. Ry. Co.,* 70 Tex. 602, 8 Am. St. Rep. 624, 8 S. W. 491; *Rockford Co.* v. *Phillips,* 66 Ill. 548; *Keating* v. *Detroit etc. R. Co.,* 104 Mich. 418, 62 N. W. 575; *Claxton* v. *Lexington etc. R. Co.,* 13 Bush, 636; *Rouse* v. *Downs,* 5 Kan. App. 549, 47 Pac. 983; *Cleveland etc. R. Co.* v. *Asbury,* 120 Ind. 289, 22 N. E. 141;

*Kramm* v. *Stockton El. R. Co.,* 3 Cal. App. 606, 86 Pac. 738, 904.) With complaints containing similar allegations,—*Wall* v. *Helena St. Ry. Co.,* 12 Mont. 44, 29 Pac. 721, and *Bourke* v. *Butte Electric etc. Co.,* 33 Mont. 267, 83 Pac. 471,—were determined as though the actions were for negligence.

To constitute contributory negligence a defense, it must be shown that such contributory negligence was the proximate cause of the accident. In this case the death of Yergy was not the result of the impact or collision of the car with the vehicle in which he was sitting, but was the result of the wheel of the car running over him at a point 87.8 feet from the place of such collision, and this was the result and consequence of defendant's failure to stop the car. While he was on the ground, helpless, it is absurd to suppose that any act of his contributed to such running over.

The following cases establish what is sometimes called ''the last clear chance'' or the ''humane'' doctrine, as the exception to the general rule of contributory negligence. (*Wall* v. *Helena St. Ry. Co.,* 12 Mont. 44, 29 Pac. 721; *Neary* v. *Northern Pac. Ry. Co.,* 37 Mont. 461, 97 Pac. 945; *Indianapolis St. Ry. Co.* v. *Schmidt,* 35 Ind. App. 202, 71 N. E. 666, 72 N. E. 478; *Cleveland C. C. & Co.* v. *Klee,* 154 Ind. 430, 56 N. E. 236; *Citizens' St. Ry. Co.* v. *Hamer,* 29 Ind. App. 426, 62 N. E. 660, 63 N. E. 778; *Philadelphia etc. R. Co.* v. *Kutt,* 148 Fed. 820; *Weitzman* v. *Nassau El. R. Co.,* 53 N. Y. Supp. 905, 33 App. Div. 585; *Mayes* v. *Metropolitan S. R. Co.,* 121 Mo. App. 614, 97 S. W. 612; *Cole* v. *Metropolitan S. R. Co.,* 121 Mo. App. 605, 97 S. W. 555; *Goff* v. *St. Louis Transit Co.,* 199 Mo. 694, 98 S. W. 49, 9 L. R. A., n. s., 244; *Baker* v. *Wilmington etc. Ry. Co.,* 118 N. C. 1015, 24 S. E. 415; *Green* v. *Metropolitan S. Ry. Co.,* 171 N. Y. 201, 80 Am. St. Rep. 807, 63 N. E. 958; *Harrington* v. *Los Angeles R. Co.,* 140 Cal. 514, 98 Am. St. Rep. 85, 74 Pac. 15, 63 L. R. A. 240, 242; *Richmond Passenger etc. Co.* v. *Gordon,* 102 Va. 498, 46 S. E. 772; *Louisville etc. Ry. Co.* v. *Edelen,* 123 Ky. 629, 96 S. W. 902; *Thompson* v. *Salt Lake etc. Co.,* 16 Utah,

281, 67 Am. St. Rep. 621, 52 Pac. 92, 40 L. R. A. 172; *Scott* v. *San Bernardino V. T. Co.*, 152 Cal. 604, 93 Pac. 680; *Teakle* v. *San Pedro etc. R. Co.*, 32 Utah, 276, 90 Pac. 405, 408, 409, 10 L. R. A., n. s., 486; *Spiking* v. *Consolidated Ry. & P. Co.*, 33 Utah, 313, 93 Pac. 838; 1 Thompson on Negligence, secs. 232, 236; 2 Thompson on Negligence, secs. 1475-1477; Thompson on Negligence, Supplement, secs. 239, 240.)

The evidence shows a wanton, willful disregard of the safety of travelers by the motorman of the car in question at the time of the injury. Where this element enters into the conduct of the defendant, or its employees, at the time and place of the accident, the prior want of ordinary care on the part of the deceased is no defense. (*Neary* v. *Northern Pacific R. Co.*, 37 Mont. 461, 97 Pac. 948, 949; *Evansville St. R. Co.* v. *Gentry*, 147 Ind. 408, 62 Am. St. Rep. 421, 44 N. E. 311, 37 L. R. A. 378; *Montgomery* v. *Lansing C. E. Co.*, 103 Mich. 46, 61 N. W. 543, 29 L. R. A. 289; *Harrington* v. *Los Angeles Ry. Co.;* 140 Cal. 514, 98 Am. St. Rep. 85, 74 Pac. 15, 63 L. R. A. 240, 242; *Kramm* v. *Stockton Electric R. Co.*, 36 Cal. App. 606, 86 Pac. 738, 904.)

When the evidence is undisputed, or, when there is no evidence, the question of proximate cause of an injury, and its corollary contributory negligence of the deceased, become a matter of law for the court and should not be submitted to the jury. (*Cole* v. *German S. & L. Soc.*, 124 Fed. 113, 59 C. C. A. 593, 63 L. R. A. 423; *Snyder* v. *Colorado etc. R. Co.*, 36 Colo. 288, 118 Am. St. Rep. 110, 85 Pac. 686, 8 L. R. A., n. s., 781; *Missouri Pac. Ry.* v. *Columbia*, 65 Kan. 390, 69 Pac. 338, 58 L. R. A. 399; *McGhee* v. *Norfolk etc. Ry. Co.*, 147 N. C. 142, 60 S. E. 917.)

In such cases as this, the age of the deceased, his probable expectancy of life, his occupation, his ability to labor, his accustomed earnings, his general health and intelligence, his habits and capacity, mental and physical, to earn and acquire property, what he had saved and what he would have accumulated had he lived, are all to be considered. (*Louisville etc. R. Co.* v. *Clarke*, 152 U. S. 242, 14 Sup. Ct. 579, 38 L. Ed. 425; *Skottowe* v. *Ore-*

*gon etc. R. Co.,* 22 Or. 430, 30 Pac. 222, 16 L. R. A. 593-600; *Carey* v. *Berkshire R. R. Co.,* 48 Am. Dec. 639, note; *Illinois C. R. Co.* v. *Davidson,* 76 Fed. 521, 522, 22 C. C. A. 306, and cases there cited; *Morgan* v. *Southern Pac. Co.,* 95 Cal. 510, 519, 29 Am. St. Rep. 143, 30 Pac. 603, 17 L. R. A. 71; *Ruppel* v. *United Railroads,* 1 Cal. App. 666, 82 Pac. 1074; *Silsby* v. *Michigan Car Co.,* 95 Mich. 209, 54 N. W. 761; *Masterton* v. *Vernon,* 58 N. Y. 396.) Nonexperts who are shown to be familiar with the extent and character of the particular service may properly give their opinion of the value of that service. (*Forbes* v. *Howard,* 4 R. I. 364; *Mercer* v. *Vose,* 67 N. Y. 57; *Edwards* v. *Fargo & S. Ry. Co.,* 4 Dak. 549, 33 N. W. 100; *Cowdery* v. *McChesney,* 124 Cal. 363, 57 Pac. 221.)

The character and extent of the business of a person injured to which he devoted his personal attention, and the profits therefrom, may be given in evidence in a personal injury action, as tending to establish the extent of his loss of earnings or earning power. (*Chicago, R. I. & Pac. Ry. Co.* v. *Scheinkoenig,* 62 Kan. 57, 61 Pac. 415; *Chicago etc. Ry. Co.* v. *Posten,* 59 Kan. 449, 53 Pac. 466; *City of Terre Haute* v. *Hudnut,* 112 Ind. 542, 13 N. E. 686.)

MR. JUSTICE SMITH delivered the opinion of the court.

These are appeals from a judgment entered on the verdict of a jury, and from an order denying a new trial, in a case in which Mary Alice Yergy, as executrix, the plaintiff, was awarded damages in the sum of $40,000 on account of the alleged negligence of the defendants, the Helena Light and Railway Company and Stephen Peterson, its motorman, resulting in the death of plaintiff's husband, George O. Yergy, a lumber dealer in the city of Helena. The death occurred on December 1, 1906, and resulted from a collision between one of the defendant company's street railway cars propelled by electricity, which was being operated by Peterson, and a buggy drawn by a single horse, in which buggy the deceased, Yergy, was attempting to cross the railway tracks at the intersection of Lyndale and Benton avenues. The com-

plaint alleges that Peterson "did not keep any lookout for persons or vehicles who were then approaching or crossing the tracks; nor did he have said car under sufficient, or any, control, so as to avoid injuring travelers passing over the railway tracks; nor did the defendant stop said car in time to avoid injuring Yergy, but, on the contrary, the said street-car was then and there by the defendants run at a high, negligent and dangerous rate of speed, and far in excess of that allowed by law, whereby the said car was propelled and driven with great violence at and against the vehicle in which Yergy then and there was, and the said vehicle was upset and thrown over, and the said Yergy was thrown thereout and cast upon the ground, after which, and by reason of the careless and negligent management and operation of said car, said Yergy was drawn and dragged by the same over and along the ground, and over and along the railway tracks, for a great distance, and was drawn and dragged under the wheels of said car, and the same were then and there run and driven over him, whereby he was then and there crushed and killed." Then follows an allegation that the defendants, in so running the car and causing the death of Yergy, "acted in a willfully and recklessly negligent manner, and without any regard to their duty in the premises, and without any regard to the safety, rights, and life of said Yergy." The complaint also contains the allegation that "deceased left no children or other heirs dependent upon him, save and except the plaintiff." The defendants denied negligence on their part, and alleged (1) that the proximate cause of the death of Yergy was his own negligence; and (2) that he was guilty of contributory negligence.

The first complaint made by the appellants is this: That the court erred in allowing plaintiff's witness, Samuel M. Ross, to testify as to the distances within which a street-car could be stopped, under certain circumstances, when going at different rates of speed. The witness had testified that he was inspector of railways for the State Railway Commission, and had had eight years' experience in the railroad business; that he had acted as

a street-car conductor for about three months, but had never been a motorman; that he had taken a motorman's place several times, and had stopped electric cars; that he had observed the speed of cars and the stopping of cars, and had some knowledge of the space in which cars running by electricity could be stopped. He said he had never stopped a car in an emergency, and had never seen the car which caused the accident, but that "he was in a position to tell the court in what space a car could be stopped" under the circumstances narrated in the question propounded to him. We think there was no prejudicial error in the ruling complained of. The competency of the witness was a matter for the court to decide, and one in which its discretion could properly be exercised. We find no abuse of discretion, and in addition, other witnesses for the plaintiff testified to the same general import, and the testimony of Ross in effect was cumulative.

In order to properly illustrate the other propositions of law involved, it seems necessary to set forth a portion of the testimony. John Edgerton, a witness for the plaintiff, testified that he was in a cab on Lyndale avenue, which is a street of average travel, on the evening in question; that at some distance east of the intersection of Lyndale and Benton avenues the cab passed a buggy, in which the deceased Yergy was riding. The cab was going at the rate of from six to seven miles an hour. As the cab passed the buggy, the horse attached to the buggy began to trot. There was an arc light at the intersection of the two avenues, and the street-car could be seen approaching for many hundred feet south of the intersection of the two streets. The cab had reached a point approximately one hundred feet west of the railroad track, when the witness looked out to see if the approaching car would stop at Lyndale avenue. At that time the car was running at the rate of about twenty-two miles an hour. Witness first saw the car approaching when it was at a point about four hundred feet south of the intersection of the two streets. He heard the gong of the street-car sounding. When the car was at a point from fifty to one hundred feet

south of the intersection of the railroad track and the roadway of Lyndale avenue, there was a succession of strokes on the gong. Witness and the driver of the cab, learning that a collision had taken place, returned to the point on Benton avenue where the car was stopped. Mr. Yergy at that time was lying across the track, with his head on the rail between the two west wheels of the forward truck of the car. He appeared to be dead. The car stopped at a point about eighty-seven feet north of the intersection of the two avenues. The car was illuminated, and was easily visible. There was introduced in evidence an ordinance of the city of Helena, prescribing that the rate of speed for street-cars at the point in question should not exceed twelve miles per hour.

Nathan Godfrey, an insurance agent, testified that his company would charge for an annuity of $5,000 per annum, for a man forty-nine years of age, for the balance of his life, the sum of $71,800.

Ben. Hay, the cab driver, testified that, when the car stopped, the front wheel of the forward truck was off the track; that Mr. Yergy did not look around when the cab passed his buggy, and paid no attention at all to the cab as it passed.

Amos Shelladay, a witness for the plaintiff, testified that he was a former employee of the defendant company; that he knew the car in question; that for a couple of hundred feet south of the intersection of Lyndale and Benton avenues the street car track was practically level; that under the conditions existing on the night in question the car could have been stopped in the space of twenty feet, going at the rate of eight miles an hour; that at the rate of twelve miles an hour it ought to be stopped in practically the same distance, and, going at the rate of eighteen or twenty miles an hour, the car could be stopped in fifty feet. J. W. Ludwick substantially corroborated Shelladay.

J. B. Sanford testified that he had known deceased for twenty years; that he was in the planing-mill and lumber-yard business, and witness at one time conducted a similar business for a period of thirty-five years; that he had a great deal of business

with Mr. Yergy, and "could tell his capacity as a business man was first-class, particularly as to the kind of business he was conducting. In my judgment his earning capacity prior to his death was worth $5,000 a year. He was a very good mechanic, and understood the running of a planing-mill and keeping machinery in order. He was his own bookkeeper, and thoroughly acquainted with lumber, and the buying and selling of it, and he was a working man besides. It is pretty hard to find a man with all the qualifications that he had. Very seldom will you find a man that could do it, and that is the reason I say his time would be worth that for a man doing that kind of business."

Thomas E. Goodwin, an expert accountant, testified that he had examined the books of Mr. Yergy, and that these books disclosed the fact that for several years prior to his death the profits of Mr. Yergy's business averaged about $8,700 per annum. This testimony was not objected to at the time it was given. At the close of plaintiff's case the defendants interposed a motion for a nonsuit, for two reasons: (1) That no evidence had been introduced to support the allegations of the complaint that the acts of the defendants were willful; and (2) that "the evidence shows only the happening of the accident and its results, and does not show the circumstances immediately accompanying it, so that the only inference which can be drawn from the facts testified to is that the deceased got upon the track of the defendant company, in full view of the rapidly moving car, which said car was lighted, so that it could be readily seen, and with the gong ringing so that it could be readily heard; and the evidence fails to show that the deceased was at that time in the exercise of ordinary care, and also fails to show that the accident was proximately caused by the negligence of the defendant." This motion was denied, whereupon the defendant moved to strike from the record the testimony of Mr. Goodwin as to the showing made by the books of the Yergy estate, "for the reason that the same is incompetent and immaterial, and that earnings of business are speculative in character, and do not form the proper measure of damages." The court overruled the motion, and the defendants saved an exception.

On the part of the defendants testimony was then introduced which tended to show that the car could not be stopped within the distances testified to by plaintiff's witnesses. Stephen Peterson testified: "I am the motorman who is one of the defendants in this case. I got no signal to stop for Lyndale avenue, and I kept going right along on down to about forty feet away from Lyndale avenue. A horse stepped in on the crosswalk, and as soon as I saw the horse stepping on the crosswalk, I set on the brake, and saw that he wasn't stopping, and I reversed the car as fast as I could, and he never paid any attention to me until I got—the horse didn't pay any attention. Before he got on the track, kind of stopped. The man never paid any attention to me at all, and the horse got on the track and got scared of the headlight, and he made a jump, and when he made that jump he stopped again and I got the man. I first saw the horse coming in on the street when I was about forty feet away from Lyndale avenue. I was ringing the gong loud; I sounded it four or five times. When I first saw the horse, he just stepped on to the cross-walk that runs across Lyndale avenue. I rang the bell at that time—the horse made a jump, and the buggy was just in the middle of the track. The man, when I first saw him, was sitting with his head down at that time. I think he was about thirty feet away from me. He was going just about five miles an hour. The horse was trotting along. I was going about eight miles an hour. I reversed the car and set the brakes, and tried to stop the car. The car responded readily to my movement. I had not struck the buggy when I got the power reversed. I was then about ten feet from Lyndale avenue. I had not seen the man at any time before the horse stepped on the crosswalk. I kept looking along the street ahead." On cross-examination he said: "I had no power at all. I was just going down the grade with the momentum of the car. I was looking right in the street out of the corners of my eyes. My gaze was directed on the street ahead. I did not look east on Lyndale avenue—east of Benton avenue—to see if anybody was coming. I did not look

that way, because if I look that way somebody might be coming from the other side. There was nothing to stop me from looking on Lyndale avenue east of Benton avenue. I would not be enabled to see anything at the point in question, except what was under the light. The only efforts that I made to keep the car under control before coming to Lyndale avenue, and before I saw the horse and buggy, was to take up a little slack out of the brake. That is all that was necessary. I had my hand on the brake. When I first saw Mr. Yergy, he had his head down, and was not paying any attention. I saw then that he was in a point of danger, and did not pay any attention to things. As soon as I saw that, I began to tighten up my brakes. I had to make three turns to tighten up my brakes. I was about forty feet from the man when I made these three turns in the brakes. It takes pretty nearly forty feet to get the brake on. As a matter of fact I did not have my brake on until I got up to the buggy; I could not get it on any quicker. It took me forty feet before I got the brake on. At the same time I reversed the power with one hand, and set the brake with the other. The power was reversed, and the wheels were going backward, when I reached the place where the buggy and horse were. The reversed power was on about four or five feet from the horse and buggy. It was three or four feet before the wheels began to go backward, and forty feet before the brakes were on. The car slid about fifty feet after I struck the buggy. After I got in collision with the buggy, I could not do anything else than just keep the power on and setting the brakes. I had the power reversed, and I had the brakes on all the time. When I saw Mr. Yergy, he just looked up a little about the time I came to him. He kind of turned his head up against me—I mean by that, looking at me. I was standing above him, on the platform. He just turned his head up, and looked a little bit. The horse was across the track when we hit the buggy, just about three or four feet. The front wheels of the buggy were just on the rail— two wheels on each rail, and we crashed right into the buggy between the two wheels. The body of the buggy was not under

the car at all. It never got under the car. After striking the buggy, Mr. Yergy's body got under the car, just about forty-five or fifty feet. Mr. Yergy's body did not get under the car until we got past the north line of Lyndale avenue. Up to that distance we had been shoving the buggy and the man ahead of us.''

Ruth Bower, a girl of fifteen years of age, testified that she was at the crossing when Mr. Yergy passed. She said: ''The car was coming pretty fast down the hill, and the gong was sounding, and I was waiting for the buggy to cross, and while I was standing there I heard the crash, and I turned around and saw the smash-up. The man was driving at a slow trot. He was just sitting still in the buggy. He did not see me; he was looking straight ahead. I made an outcry. I said, 'Look out! you will get hurt,' and he did not pay any attention to that. Mr. Yergy did not seem to hear me when I called to him. I did not think he heard me at all.''

Walter Card testified that he was a passenger on the car in question; that his attention was attracted by the sounding of the gong; that he looked out, and saw the man in the buggy, who was apparently either absorbed in thought or sleeping. The witness continued: ''He was sitting in a kind of a crouched position, looking down in the street ahead, neither to the right nor to the left. The gong had been sounding up until then. Until the car was right on to him you might say he didn't appear to know who was in the way. He then attempted to gather up his lines, and to either get across the track or whip up the horse, but was hit before he could do so. The car was going at the ordinary rate of speed. When I saw the buggy, I saw the motorman put on his brakes, trying to stop the car. I could not say what effect it had on the car, as to stopping it. · As soon as the extra loud sounding of the gong commenced, I looked out and saw the horse. The horse was then just off the crossing, and the buggy was still on the crossway. The horse extended the length of the horse into Benton avenue. I did not think there was any reason to apprehend danger when I saw this man

and the buggy in that position. I saw him lift his head. He was close to the track then. The horse must have been just about over the track when he lifted his head. He looked as if he recognized the fact that he was in danger; that was apparently the first time that he recognized the fact that he was in danger. The electric light was quite distinct. I had no trouble in seeing around there.''

Frank J. Wise testified that he saw Mr. Yergy on the evening in question, just before the accident happened; that he was driving in a kind of a dogtrot. ''He was sitting in the buggy kind of stooped down; he had a cloth coat and a fur collar. He did not notice us at all apparently; passed very close to us. I saw the car coming. I could see the light. The car was moving rapidly, just as it generally was. The gong was sounding, and the accident happened just at the same time. Mr. Yergy never looked up. I heard the gong sound, and my attention was called to him when that man came to a stop, and then it all happened in just a twinkling of an eye, in less time than it takes me to tell it. That is the only time I heard the gong sound. The motorman sounded the gong immediately before he hit the man. It was all in the twinkling of an eye, like a flash of lightning. The car did not seem to stop right at once; it went quite a little distance. It went on past the corner. It was not very light there. There was a dim light there. There was an electric light. It was just about light enough to see the wheels of the car, but you could not see whether they were revolving.''

Mrs. Frank J. Wise testified that she was with her husband. ''Mr. Yergy was near the track when I heard the gong, driving along. He was dressed in an overcoat, and he had the collar up, and was kind of looking down. When he passed us, he was sitting in the buggy in the same position. He paid no attention to us at all; didn't seem to notice us. I did not see him paying any attention to the sounding of the gong. It only took a few seconds to enact the whole thing. When I heard the gong sound, the car was about two or three hundred feet south of Lyndale avenue; that was what drew my attention to the car—the gong.

It was two or three seconds between the sounding of the gong and the striking of the buggy. I think my husband is mistaken when he says that the sounding of the gong was so near to the hitting of the buggy that the whole happened in the twinkling of an eye. I think there was a more appreciable time. That is what drew my attention to it. When the car was two or three hundred feet away, the buggy was on the other side of the crossing; near the crossing—the foot crossing on Lyndale avenue. When the buggy and horse were crossing the footwalk on Lyndale avenue, the car was two hundred feet away, as near as I can tell.''

Paul Bickel testified: ''I was on the front part of the car. I saw the buggy before the car struck it. I should say the car, when I first noticed it, was about ninety feet from the crossing —maybe not that far—and at that time the buggy was just across the sidewalk. The motorman's bell was ringing at that time, and I heard it distinctly. He was applying the brakes all the time; at the same time he was ringing the bell. I should think that the motorman reversed the current; the jar would indicate that he did. The horse had just got by, and it hit the buggy, and it crushed right under the car, and the man went with it. I should say that the car was running about eight or or nine miles an hour. I should think the car was about ninety feet from the crossing of Lyndale and Benton avenues when I heard the gong ring, and that was the time when I saw the buggy. It was brightly lighted around there so that I could see. There was no obstruction there. As far as I can remember, the horse was just across the middle of the street, trotting along about five miles an hour, about half as fast as the car was going.''

As we understand the complaint (and this understanding is based partially upon statements in the briefs of counsel for the respondent), the theory of the pleader was that the proximate cause of the death of Mr. Yergy was the negligence of the defendants after the collision took place. We think this is the only ground of negligence stated in the complaint. Error is assigned

upon the action of the court in overruling defendants' motion for a nonsuit. It is true, in our judgment, that no evidence of willful conduct was introduced; but we do not regard the allegation of the complaint relating thereto as being of the *gravamen* of the pleading. It simply stands by itself, and no conclusion seems to be predicated upon it. (See *Robinson* v. *Helena Light & Ry. Co.*, 38 Mont. 222, 99 Pac. 837.) The second ground of the motion was that the testimony of the plaintiff disclosed the fact that deceased was guilty of contributory negligence precluding a recovery. Bearing in mind that the negligence charged was founded upon the failure to exercise reasonable care after the collision; that there was no evidence as to the precise moment of time at which Mr. Yergy was killed, and no evidence as to what, if any, efforts were made to stop the car, we are not prepared to say that the action of the court in overruling the motion would not have been error had the defendants elected to rest their case upon it, and had they not supplemented the plaintiff's case by their own testimony, followed by their decision not to object to instructions allowing the jury to predicate negligence upon the conduct of the motorman between the time he first observed Mr. Yergy and the moment of collision. But the testimony on the part of the plaintiff was very materially supplemented by that of the motorman himself, and also by that of Mr. Bickel and Mrs. Wise. Under these circumstances we may not inquire whether the court erred in refusing to grant the motion for a nonsuit. Defendants' testimony cured the defects in that of plaintiff. (*Alderson* v. *Marshall*, 7 Mont. 288, 16 Pac. 576; *T. C. Power & Bro.* v. *Stocking*, 26 Mont. 478, 68 Pac. 857.)

We shall assume, for the purposes of this decision, that Mr. Yergy was negligent in placing himself in a situation of peril. It is not a violent inference that he was asleep in his buggy up to a moment just prior to the collision. The testimony of the motorman, however, is to the effect that he saw deceased, and appreciated his peril, when the car was forty feet south of Lyndale avenue. He then sounded the gong. Edgerton testified

that the car was fifty to one hundred feet from the crossing when the gong first sounded; while Bickel testified that he heard the sound when the car was ninety feet south of the crossing, and Mrs. Wise said she heard it when the car was two or three hundred feet from the point of collision. Peterson testified that the speed of the car was eight miles per hour, and plaintiff's testimony tended to show that, going at that rate of speed, the car could have been stopped in the space of twenty feet. This testimony, which it was the right of the jury to believe, furnished ample basis for the application of the doctrine of last clear chance before the moment of collision.

The court instructed the jury, without objection, as follows: "(6) The jury are instructed that it is the duty of the motorman running a street-car to keep a constant lookout for persons approaching the track; and, on the approach of a person or vehicle near the track with the apparent purpose of crossing, to use every means in his power, consistent with the safety of his passengers, to stop the car and avoid a collision; and, if the jury believe from the evidence in this case that the injury and death of George O. Yergy were caused by the failure of the motorman to keep such constant loookout, or to use the means within his power to stop the car and avoid the collision, the defendants are liable for the injury and death of the said George O. Yergy.

"(7) The court instructs the jury that it is the duty of a street railway company to so regulate the movement of its cars at the intersection of streets as not to unnecessarily expose drivers of vehicles to the dangers of collision. It is consequently the duty of the street-car company to have its car under control, and to operate the same with reasonable care at street intersections; and, if it fails in the duty, then it is liable for such damages as may happen to a person injured because of such failure.

"(8) You are further instructed that, if a person be seen approaching the tracks of the defendant electric street railway, who is apparently capable of taking care of himself, the motorman may assume that such person will not attempt to cross the

track if danger is imminent, or that he will leave the track before the car reaches him; and this presumption may be indulged in so long as the danger of injuring him does not appear imminent, and it is not necessary for a motorman to slacken the speed of a car upon seeing a person approaching the crossing of the street railway until such danger does (not) appear to him imminent.

"(9) The court further instructs the jury that the duty of a street railway company, and its motorman in charge of a car, to control the same at street intersections, in order to avoid collision, does not arise solely when a person is on the track, but also obtains if his danger was apparent while he was approaching the track."

The following instruction was also given: "(11) If the jury believe from the evidence that the deceased, George O. Yergy, got upon the track of the street-car, or was in the act of approaching the track in such a way as to indicate to the motorman, or apprise the motorman in charge of the car, that he was in the act of getting upon the track, far enough ahead of the car that the motorman, in the exercise of ordinary care, could have seen that fact in time, and either by stopping the car or arresting its motion, and thus avoided injuring Yergy, and you believe from the evidence that the motorman failed to do this, then the law is for the plaintiff, although you may believe that Yergy himself was negligent." The record discloses no objection to this instruction, but does show that the defendants *excepted* to the same "upon the ground that there was no evidence in the case to support the instruction based upon the divisibility of the accident." This exception, even though we could consider it in the absence of a prior objection, was not well taken, for the reason, as we have heretofore pointed out, that there was testimony in the record to warrant it, provided the complaint was so framed as to cover that ground of negligence. The latter question, however, was not raised by the exception. It is apparent, therefore, that the cause was tried on the theory,— in which defendants participated,—that negligence could prop-

erly be predicated, not only upon the failure of Peterson to exercise reasonable care after the collision, but also, after Yergy was discovered in a situation of peril, before that event.

But it is contended by the appellants, quoting from the opinion of the court in *Louisville & N. R. Co.* v. *Young,* 153 Ala. 232, 45 South. 238, 16 L. R. A., n. s., 301, that "the negligence to liability consists in a failure to perform the duty declared, and not in the ultimate effect produced." Assuming this to be a correct statement of the law, the jury in this case, in the light of Peterson's testimony, and the fact that the car ran more than eighty-seven feet after the collision, may have believed that he made no reasonable effort to stop, after (as he said) "I saw that he was in a point of danger, and did not pay any attention to things."

Defendants requested the court to charge the jury as follows: "(1) You are instructed that the basis of this action is negligence. Negligence may be defined to be the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or the doing of something which a prudent and reasonable man would not do under the circumstances of a given case. Before you can find for the plaintiff, therefore, you must find the defendants to have been guilty of negligence as alleged in the complaint; and, if the deceased was himself guilty of negligence which proximately contributed to the injury complained of, he cannot recover." The court modified this instruction by adding thereto, "except under the condition and the law as defined to you hereinafter." The record discloses no objection to the modified instruction, but does show that the defendants excepted thereto, for the reason that the instruction as given "destroyed the right of the defendants to a verdict in the event that the negligence of the deceased was the proximate cause of the injury." But we shall consider this instruction in connection with others which involve the same question of law.

Defendants also requested this instruction: "(9) You are hereby instructed that, if you find from the evidence that the

car was running at a moderate or ordinary rate of speed, and
that the bell or gong had been sounded, and that the plaintiff
suddenly and without warning, and under circumstances which
were not reasonably to be expected, drove upon or attempted to
cross the track of the defendant company in close proximity to
the car of the defendant company, and at a time when it was
not prudent to do so, then and in that event deceased would not
be exercising ordinary care or prudence, and your verdict must
be for the defendants.'' The court made this addition thereto:
''Unless you further find from the evidence that the defendants
might have avoided the injury to the said George O. Yergy by
the exercise of ordinary care after the collision took place, as
hereinafter stated. If the jury believe from the evidence that
the death of George O. Yergy was brought about by the want
of ordinary care on the part of the motorman in charge of the
car in running at a rate of speed in excess of that permitted by
the ordinances of the city of Helena, or in failing to have the
car under such control as that its speed might have been less-
ened, or the car stopped, and if they further believe from the
evidence that such want of ordinary care, if any, continued af-
ter the collision between the car and the vehicle driven by said
George O. Yergy, and after said Yergy was under said car, then
whatever negligence that Yergy might have been guilty of in be-
ing upon the track at the moment of collision cannot be said to
have been the proximate cause of his death, their verdict should
be for the plaintiff.'' With relation to this instruction, and the
action of the court thereon, the record recites: ''To the refusal
of the court to give instruction No. 9, as requested by the de-
fendants, and to the giving of said instruction No. 9 as modi-
fied as instruction No. 10, the defendants then and there *ob-
jected,* upon the ground that there was no evidence to warrant
the giving of the modification, and that the modified instruction
would permit the jury to find for the plaintiff, although the
contributory negligence of the deceased was the proximate cause
of the accident.'' It is earnestly contended, in the reply brief
of appellants, that the court erred in this connection, because

the instruction as modified allowed the jury to predicate negligence for which recovery could be had upon a continuance of the same primary negligence which was offset by the contributory negligence of the deceased, and thus destroyed the defense of contributory negligence.  Cases are cited which seem to sustain the appellants' position, but we cannot consider them or the alleged error.  In so far as the instruction requested is concerned, what is hereafter said with reference to request No. 14 disposes of the same.  It will be observed that, technically, no exception was saved to the action of the court in refusing to give the instruction requested.  But we pass that.  The fact that no exception was taken to the action of the court in overruling the objection to the modified instruction, makes it impossible for this court to consider the ruling of the court below.  (See *Robinson* v. *Helena Light & Ry. Co., supra.*)

The defendants also requested this instruction: "(12) You are instructed that it was the duty of the deceased, George O. Yergy, before going on or across the track of the defendant company, to look and listen for approaching cars of said defendant company; and if you find from the evidence that the deceased, George O. Yergy, failed so to do, and that by looking and listening he could have seen or heard the approaching car of the defendant company in time to have averted the injury to himself, then you must find your verdict for the defendant, unless you further find from the evidence that the employees of the defendant, engaged in the operation of its car, after they saw, or by the exercise of ordinary care could have seen, that deceased was in a position of peril, failed to use such care and caution in stopping said car to avoid injury to said deceased, George O. Yergy, as a person of ordinary care and prudence would have exercised under like and similar circumstances." This instruction the court refused to give, and defendants excepted, upon the ground that the refusal did away with the defense of contributory negligence.  The court, however, did charge the jury that if the injury to Yergy could have been avoided by the exercise of ordinary care, after he was discov-

ered in a place of peril, or after the collision, then the defense of contributory negligence was not available to the defendants. The court also, in instruction No. 1 (being defendants' request No. 1 as modified, heretofore considered), told the jury that if the deceased was himself guilty of negligence which proximately contributed to the injury complained of, plaintiff could not recover, "except under the condition and the law as defined to you hereafter." The court also told the jury that it was "the duty of a person approaching the crossing of a street railway in a street to use his senses, his eyes and ears, to discover the proximity and passage of the cars of the railroad company, before proceeding across the track, and a failure to do so would constitute contributory negligence." In instruction 15 the court defined contributory negligence as follows: "The court instructs the jury that one of the defenses interposed by the defendants in this action is contributory negligence on the part of George O. Yergy. Contributory negligence may be defined as follows: One who through the mere negligence of another suffers an injury, to the bringing about of which the willfulness or want of ordinary care on the part of the injured person has so far proximately contributed as that, but for such concurring and cooperating fault, the injury would not have happened." We are of opinion that all the instructions, taken together, left the jury free to consider the defense of contributory negligence, and that they must have understood from the instructions given that there could be no recovery unless the doctrine of last clear chance could, under the testimony, be successfully invoked by the plaintiff.

The following instruction was also requested: "(14) If you believe from the evidence that said George O. Yergy drove upon said railway track after he saw, or by the use of ordinary care and watchfulness could have seen for a distance of at least five hundred feet, the said car of the Helena Light and Railway Company approaching the crossing at ordinary speed, when by stopping his horse before going upon the tracks a collision could have been avoided, your verdict should be for the defendants."

This instruction was properly refused, for the reason that it would have enabled the jury, had they followed it, to find for the defendants regardless of the question of defendants' conduct after deceased was discovered in a place of peril; and other instructions were given properly dealing with this question.

Requested instruction No. 17 reads as follows: "Even if you believe from the evidence that the defendants were negligent in the management of the said car at the time and place alleged, and that the said George O. Yergy was in no respect negligent, unless you find that the defendant then and there managed said car in both a willful and recklessly negligent manner, your verdict should be for the defendants." This instruction was properly refused, for the reasons heretofore stated in relation to the same subject matter, and for the further reason that there was evidence in the case sufficient to warrant a verdict for the plaintiff, aside from any question of willful or reckless conduct on the part of the defendants.

The defendants also requested the following instruction: "(19) You are instructed that, if you find from the evidence that the deceased and the defendant were both negligent, and that the negligence of both directly contributed to cause the injury complained of, then your verdict should be for the defendants." This was properly refused, for the reasons applicable to request No. 14.

Instruction No. 12, which the court gave, reads as follows: "The court instructs the jury that street-cars propelled by electricity cannot be lawfully run at a rate of speed which is incompatible with the lawful and customary use of the street by others with reasonable safety. Nor can such cars be lawfully run at a rate of speed in excess of that allowed by ordinance. So in this case, if you find from the evidence that there is an ordinance of the city of Helena prohibiting electric cars, at the place where deceased George O. Yergy came to his death, to run at a greater speed than twelve miles per hour, and that at the time and place of such death of said Yergy the defendant's car was running at a greater speed than such twelve miles

per hour, and the death of said Yergy was occasioned thereby, then the defendants were guilty of negligence, and are liable for the damages resulting therefrom.'' Defendants contend that by this instruction "the jury was told that, if Yergy's death was caused by a speed of more than twelve miles per hour, 'defendants are liable for the damages resulting therefrom.' '' The record recites that the following proceedings were had with reference to this instruction: "To the giving of which said instruction the defendants then and there excepted, upon the ground that there was no evidence in the case to support the instruction, and that it did away with the defense of contributory negligence." There is ample evidence in the record to warrant the conclusion that the car was propelled at a rate of speed exceeding twelve miles per hour, and at an excessive rate of speed. But we are not permitted to consider the assignment of error, because the defendants either failed to object to the instruction, or to except to the ruling of the court (if the court ruled). (See *Robinson* v. *Helena Light & Ry. Co., supra.*) The law reads thus: "The court shall pass upon the objections to the instructions requested and also those proposed to be given by the court. * * * No motion for a new trial on the ground of errors in the instructions given shall be granted by the district court unless such errors are specifically pointed out and excepted to at the settlement of the instructions. * * * No cause shall be reversed by the supreme court for any error in instructions, which was not specifically pointed out and excepted to at the settlement of the instructions, * * * and such error and exception incorporated in and settled in the bill of exceptions or statement of the case." (Revised Codes, sec. 6746.) We are not disposed to be technical about the use of terms, but if the foregoing extract from the record discloses an objection to the instruction, then there was no exception to the ruling of the court, if the court did rule; and, if it be claimed that an exception was saved, then there was no prior objection and ruling to which the exception can apply. The trial court must be given an opportunity to rule, before it can be put in error. And the

mandate of the statute applies as well to this court as to the court below; the language employed by the legislature being, "And no cause shall be reversed by the supreme court," etc.

We find in the reply brief of the appellants some criticism of other instructions, but do not discover in the record any objection to these instructions, or any exception to the action of the court in giving them. If, as is suggested in the reply brief of appellants, there be any error in those instructions of the court, which engrafted the so-called "discovery doctrine" upon the doctrine of last clear chance, it may be said that the same proposition was incorporated in one of the instructions requested by appellants themselves, and the instructions given were not objected to.

The following instructions, relating to the measure of damages, were given to the jury: "(19) The jury are instructed that, if your verdict shall be for the plaintiff, such damages may be given by you to the plaintiff as under all the circumstances of the case may be just, not exceeding the amount prayed for in the complaint. And in determining the amount of such damages you have the right to take into consideration the pecuniary loss, if any, suffered by the plaintiff in the death of said George O. Yergy, by being deprived of his support.

"(20) You are instructed that the measure of damages in this action is the present value of such a sum as you believe the deceased would probably have earned in his business during his natural lifetime, and left as his estate at the time of his death, considering his age, ability, disposition to work, habits of living, and expenditures, the capital he had at his command, and the risks incident to his business."

Respondent's counsel state in their brief that instruction 20 was given at appellants' request; but, as the record does not show this, we may not act upon the information. It is now contended that the court erred in allowing the witnesses Sanford and Goodwin "to testify to the earning capacity of the deceased." And it is said: "The jury were to find as the measure of damages the amount which the deceased would probably

have earned and saved. The question which should have been propounded was the value to his business of the services which he rendered.'' It is unnecessary to decide whether instructions 19 and 20 were erroneous, for the reason that there was no objection to them in the court below. Mr. Sanford's testimony was well within the rule now contended for by the appellants, and we think he was sufficiently qualified to express an opinion. His answer seems to have been founded entirely upon his knowledge of Mr. Yergy's personal capacity. But, assuming that the motion to strike Mr. Goodwin's testimony should have been granted, still the action of the court resulted in no prejudice to the defendants. Mr. Sanford's testimony was uncontradicted, as was also that of the insurance men, to the effect that an annuity of $5,000 would have cost Mr. Yergy the sum of over $70,000. The elements of passion and prejudice will not be presumed to have influenced the minds of jurors who return a verdict, based on competent testimony, in accordance with instructions, and easily to be arrived at by mathematical calculation. We find no error in the case justifying an unconditional reversal of the order or judgment.

But the plaintiff alleges that she is the sole dependent heir of the deceased. His estate inventoried $70,000, and there is an intimation in the record that its real value exceeded that sum. The size of this verdict is so great as to somewhat shock the mind, unless the amount be justified by the circumstances of the case. This court, and the district court, has the power to require that the plaintiff either remit a part of the amount awarded by the jury, or submit to a new trial, in cases where the damages are clearly excessive. (*Chicago T. & T. Co.* v. *O'Marr*, 25 Mont. 242, 64 Pac. 506; *Storm* v. *City of Butte*, 35 Mont. 385, 89 Pac. 726; *Western Union Telegraph Co.* v. *Bodkin* (Kan.), 101 Pac. 652.) The law is that such damages may be given as under all the circumstances of the case may be just. (Revised Codes, sec. 6486.) In this particular case we have felt justified, in view of the circumstances and the fact that the information we seek is contained in public records made by the plaintiff herself, and easily accessible, in pursuing an extrajudi-

cial inquiry. The records in the office of the clerk of the district court for Lewis and Clark county disclose, in substance, that the entire estate was left to Mrs. Yergy for life, with certain remainders over to three brothers, one sister, and one nephew of deceased, all of whom are nonresidents of Montana, none of whom, according to the allegations of the complaint, were dependent upon the deceased; and that the approved claims against the estate amount to less than $1,500. The course pursued by the court in making this inquiry is not to be construed as a precedent, for the reason that we have been actuated solely by the amount of the verdict in this particular action. The result of this litigation will be that the sum recovered by the plaintiff as executrix will simply be added to the fortune of which she will come into possession when the estate is finally settled, and at her death will go to persons who were in no way dependent upon Mr. Yergy in his lifetime. We are not unmindful of the fact that plaintiff has been under expense for the services of counsel; but the amount to which we reduce the judgment will enable her to pay reasonable attorneys' fees, and add a substantial sum to the assets of the estate.

The cause is remanded to the district court, with directions to grant a new trial, unless, within thirty days after the filing of the *remittitur* with the clerk of that court, the respondent shall file her consent in writing that the judgment may be modified by deducting from the amount thereof, as of the date of its rendition, the sum of $25,000, leaving the amount of said judgment the sum of $15,000. If such consent is given, then the judgment shall be modified accordingly, and in that event the judgment, as modified, and the order denying a new trial, will stand affirmed, the respondent to recover costs of appeal.

MR. JUSTICE HOLLOWAY concurs.

MR. CHIEF JUSTICE BRANTLY: I concur in the result reached in the foregoing opinion, and also in the propositions of law laid down, but I do not think that it is ever necessary or permissible to make an extrajudicial investigation in order to reach the proper result in any case.