CUMMINGS, RESPONDENT, v. REINS COPPER CO. ET AL.,
APPELLANTS.

(No. 2,775.)

(Submitted February 23, 1910.   Decided March 8, 1910.)

[107 Pac. 904.]

*Personal Injuries—Master and Servant—Mines—Appliances—*
*Negligence — Evidence — Insufficiency—Parties Defendant—*
*Misjoinder — Demurrer — Indemnity — Statutes — Opinion*
*Evidence—New Trial—Joint Notice—Separate Appeals.*

New Trial—Joint Notice—Separate Appeals.
  1.   The fact that two defendants (represented by the same counsel),
  against whom separate verdicts had been rendered, incorporated in
  one paper their notices of intention to move separately for new trials
  and prepared but a single bill of exceptions, showing their objections
  and exceptions, both joint and separate, which was settled without
  objection, was no reason why they should not be heard upon separate
  appeals from an order which, in denying new trials, treated their
  motions as a joint one.   The plaintiff must have understood from
  their notices of intention that he was required to meet separate
  motions, and the order of the court must be construed in the light of
  such notices.
Appeal—Notice—Service—Adverse Parties.
  2.   Two defendants, neither of whom occupied a position adverse to
  his codefendant and who were represented by the same counsel, were
  not, on taking separate appeals, required to serve their notices on each
  other.
Same—"Adverse Party"—Definition.
  3.   An "adverse party," within the meaning of section 7100, Revised
  Codes, relative to service of notice of appeal, is one who has an interest
  in opposing the object sought to be accomplished by the appeal.
Same—Review—Record.
  4.   Where a bill of exceptions is sufficient upon its face to inform the
  appellate court of all the rulings of the trial court upon which appel-
  lant relies, together with all the attendant incidents of the trial neces-
  sary to a full understanding of them, the merits of his appeal from an
  order denying his motion for a new trial will be considered notwith-
  standing his notice of intention stated that the motion would be made
  on affidavits, a bill of exceptions and the minutes of the court.   By the
  abandonment of all save one of the proposed methods of presenting
  movant's motion, his adversary was not prejudiced.
Personal Injuries — Mines — Master and Servant—Negligence—Evidence—
  Insufficiency.
  5.   Evidence, introduced by plaintiff in an action to recover damages
  for personal injuries sustained while engaged in hoisting a stick of
  timber from the lower workings in a mine to an upper one, which be-
  came unfastened from the rope by means of which it was being
  raised and struck plaintiff in its fall, *held* insufficient to make out
  a *prima facie* case of negligence on the part of the defendant com-

pany in failing to furnish plaintiff a reasonably safe and suitable appliance for use in hoisting the timber.

Same—Appliances—Extent of Duty of Master.

6.   Defendant mining company was only required to use ordinary care in selecting the appliance (a rope and pulley) it furnished to plaintiff for hoisting timbers, and in order to save itself from responsibility for accidents resulting from its use, it was not bound to furnish the best nor the safest appliance; but if, at the time it was selected, it was in general use, not obviously dangerous, and reasonably adapted to the purpose for which it was employed, the continuance of its use did not indicate negligence, even though there may have been a safer device (a rope with chain attachment for fastening timbers) used by others to accomplish the same result.

Same—Proximate Cause—Evidence—Insufficiency.

7.   To hold defendant liable for his injuries, plaintiff was bound to show, not only that the accident occurred during the course of his employment, but, also, that they were proximately caused by the negligence of his employer in furnishing him a faulty appliance; therefore, where his evidence failed to reveal a causal connection between the alleged defect and his injuries, the rope with which the timber was hoisted not having been broken but having seemingly become unfastened from some unknown cause, he was precluded from recovery.

Same—Contributory Negligence—Bar to Recovery.

8.   If the timber which struck plaintiff was improperly secured, he, having himself tied the rope, could not recover because guilty of contributory negligence and thus responsible for his own injury.

Misjoinder of Parties Defendant—Special Demurrer—By Whom.

9.   Where two defendants joined in a demurrer to a complaint on the ground that one of them had been improperly made a defendant, whereas under the rule declared in section 6534, Revised Codes, the alleged defect should have been raised by special demurrer on the part of the one improperly joined, the court did not err in overruling the demurrer as to both.

Personal Injuries—Defendants — Misjoinder — Surety Companies — Indemnity—Statutes.

10.   *Held,* that defendant surety company, which had contracted with its codefendant mining company to indemnify it, within certain limits, against liability for damages on account of personal injuries accidentally suffered by any of its employees, could not be held jointly liable with the master for negligent injury to a servant, and was therefore improperly joined as defendant; *held,* further, that section 5653, Revised Codes, providing that one who indemnifies another against an act to be done by the latter is jointly liable with the indemnitee, has no application.

Same—Opinion Evidence—When Inadmissible.

11.   The district court erred in permitting a miner to express his opinion on the witness-stand that the rope with which the timber which struck plaintiff was being hoisted, in the absence of a chain attachment, was an unsafe appliance. It was for the jury to draw the inference whether it was or not, from the facts given in evidence; the general rule being that where the facts are such as can be detailed and described, and the jury are able to understand and draw a correct conclusion from them, the necessity for opinion evidence does not exist.

*Appeal from District Court, Silver Bow County; Jeremiah J. Lynch, Judge.*

Action by A. B. Cummings against the Reins Copper Company and another. From a judgment for plaintiff and from an order denying their motions for a new trial, defendants appeal. Reversed and remanded.

*Mr. Jesse B. Roote, Mr. A. C. McDaniel,* and *Mr. James E. Murray,* filed a brief in behalf of Appellants. *Mr. Murray* argued the cause orally.

This evidence was wholly insufficient to support a verdict in favor of the plaintiff. It was incumbent on plaintiff to show that the injury is the proximate result of the negligence alleged. (*Taillon* v. *Mears,* 29 Mont. 161, 74 Pac. 421; 29 Cyc. 595.) "Where the material facts are undisputed and only one inference can be drawn from them, it is the duty of the court to decide as a matter of law whether there was negligence." (29 Cyc. 629; *Cain* v. *Gold Mountain Min. Co.,* 27 Mont. 529, 71 Pac. 1004; *McCabe* v. *Montana Central R. R. Co.,* 30 Mont. 323, 76 Pac. 701.) "Where the circumstances show nothing as to the real cause of the injury, there is a failure of proof." (26 Cyc. 442.) A servant is not entitled to have his case submitted to the jury, unless he introduces, in addition to the fact of the occurrence of the accident, some specific testimony which fairly tends to show that the employer was guilty of negligence. (Labatt on Master and Servant, sec. 835; *Soderman* v. *Kemp,* 145 N. Y. 427, 40 N. E. 212; *Shadford* v. *Ann Arbor Ry. Co.,* 111 Mich. 390, 69 N. W. 661; *Gulf etc. Ry. Co.* v. *Abbott* (Tex. Civ.), 24 S. W. 299.)

The opinions of plaintiff's so-called experts are incompetent for the purpose of establishing negligence. The general rule is, that witnesses must testify to facts and not to opinions, and whenever the question to be determined is the result of the common experience of all men of ordinary education to be inferred from particular facts, the inference is to be drawn by the jury and not by the witnesses. (*Sappenfield* v. *Main Street Ry. Co.,* 91 Cal. 48, 27 Pac. 590; *Nutt* v. *Southern Pac.*

*Ry.,* 25 Or. 291, 35 Pac. 653; *Galveston etc. Ry.* v. *English* (Tex. Civ.), 59 S. W. 626; *Teerpenning* v. *Corn Exchange Co.,* 43 N. Y. 281; *Shapter* v. *Pillar,* 28 Colo. 209, 63 Pac. 302.)

The defendant Reins Copper Company was not bound to employ the same instrumentalities as are employed by other companies. (*Washington etc. Ry. Co.* v. *McDade,* 135 U. S. 570, 10 Sup. Ct. 1044, 34 L. Ed. 240; *Mulligan* v. *Montana Union Ry. Co.,* 19 Mont. 135-138, 47 Pac. 795.)

The employer is not bound to furnish his workmen the safest machinery, nor provide the best method for its operation. If the machinery be of an ordinary character and such as can, with reasonable care, be used without danger to the employee, it is all that can be required from the employer. This is the limit of his responsibility and the sum total of his duty. (*Payne* v. *Reese,* 100 Pa. 306; *Sappenfield* v. *Main St. Ry. Co., supra; Nutt* v. *Southern Pac. Ry. Co.,* 25 Or. 291, 35 Pac. 653.) "Comparisons of tools or methods between those in use by the defendant at the time of the injury to an employee, and those which the expert witnesses may deem the safest tools in use, is incompetent and prejudicial evidence." (White on Injuries in Mines, sec. 82.)

Plaintiff assumed the risk of injury. He held himself out to his employer as an experienced miner, and was supposed to be familiar with all the various kinds of work a miner is called upon to perform. The instrumentality supplied by the master for use in hauling the timbers in question was a simple contrivance, the exact character and use of which was obvious. (See Wood on Master and Servant, secs. 349, 372; *Chicago & Alton R. R.* v. *Munroe,* 85 Ill. 25; *Mad River etc. R. R.* v. *Barber,* 5 Ohio St. 541, 67 Am. Dec. 312; *McMillan* v. *Saratoga & W. R. R. Co.,* 20 Barb. 449; *Thayer* v. *St. Louis & C. R. R. Co.,* 22 Ind. 26, 85 Am. Dec. 409; *Buzzell* v. *Laconia Mfg. Co.,* 48 Me. 113, 77 Am. Dec. 212; *Crutchfield* v. *Richmond & D. R. R. Co.,* 78 N. C. 300.)

There was a misjoinder of parties defendant. The plaintiff takes the position that the contract of insurance entered into

between the defendants, rendered the insurance company a joint tort-feasor with its codefendant. In support of this contention he relies on section 5653, Revised Codes. That section is a mere declaration of a common-law principle, and is not at all applicable in this case. This section has its origin in the proposed (Field) New York Code of 1865, and that its authors regarded it merely as a declaration of the common law. The purpose of that proposed Civil Code was to codify the common law, and the cases cited as authority for the section are *Herring* v. *Hoppock,* 15 N. Y. 409; *Fonda* v. *Van Horne,* 15 Wend. 631, 30 Am. Dec. 77; *Davis* v. *Newkirk,* 5 Denio, 92. The section was framed to cover liability for a specific act that was intended to be done by the indemnitee, and was never intended to apply to a cause of insurance against liability on account of injuries accidentally suffered. (See *Northam* v. *Casualty Co.,* 177 Fed. 981.)

Appellate courts in numerous cases have granted reversals upon the ground that counsel improperly called the attention of the jury to the fact that an insurance company would indemnify the defendant for any judgment that might be obtained. (*Lassig* v. *Barsky,* 87 N. Y. Supp. 425; *Wildrick* v. *Moore,* 66 Hun, 630, 22 N. Y. Supp. 1119; *Manigold* v. *Black River T. Co.,* 81 App. Div. 381, 80 N. Y. Supp. 861; *Cosselmon* v. *Dunfee,* 172 N. Y. 507, 65 N. E. 494; *Lipschutz* v. *Ross,* 84 N. Y. Supp. 632; *Lonestar Brewing Co.* v. *Voith* (Tex. Civ.), 84 S. W. 1100.) Particular attention is called to the following cases: *Welch* v. *Union Central Co.,* 117 Iowa, 394, 90 N. W. 828; *Robertson* v. *Wabash R. Co.,* 152 Mo. 382, 53 S. W. 1082; *Perry* v. *Western N. C. R. Co.,* 128 N. C. 471, 39 S. E. 27; *Schaefer* v. *City of Fond du Lac,* 104 Wis. 39, 80 N. W. 59; *Wood* v. *Agostines,* 72 Vt. 51, 47 Atl. 108; *St. Louis S. W. Ry. Co.* v. *Dickens* (Tex. Civ.), 56 S. W. 124; *Georgia & A. Ry.* v. *Pound,* 111 Ga. 6, 36 S. E. 312; *Southern Ry. Co.* v. *Shaw,* 86 Fed. 865, 31 C. C. A. 70; *Meyer* v. *State* (Tex. Cr.), 41 S. W. 632; *Hamilton* v. *State,* 97 Tenn. 452, 37 S. W. 194.

*Mr. John A. Smith* submitted a brief and argued the cause orally, in behalf of Respondent.

Appellant Copper Company owed respondent the duty to furnish a reasonably safe appliance for hoisting the timbers, and a reasonably safe place in which to stand while he performed the work. The suitableness and safety of the appliances may be determined by their general use by persons engaged in the same line of business. (*Johnson* v. *Union Pac. Coal Co.*, 28 Utah, 46, 76 Pac. 1039, 67 L. R. A. 506; *Boyle* v. *Union Pac. R. R. Co.*, 25 Utah, 420, 71 Pac. 988.) "The master must see that the appliances used by the servant are in a reasonably safe and suitable condition." (*Roche* v. *Denver etc. R. Co.*, 19 Colo. App. 204, 72 Pac. 880; *Atchison & E. Bridge Co.* v. *Miller*, 71 Kan. 13, 80 Pac. 18, 1 L. R. A., n. s., 682.)

Methods and conditions of employment elsewhere may be shown. (*Schroeder* v. *Chicago & N. W. Ry. Co.*, 128 Iowa, 365, 103 N. W. 985; *Dolan* v. *Boott Cotton Mills*, 185 Mass. 576, 70 N. E. 1025; *Devoe* v. *New York Cent. etc. R. R. Co.*, 174 N. Y. 1, 66 N. E. 568.) "Evidence of a practice of subjecting boilers to a hydrostatic test in a certain city has been held admissible upon a question of the necessity of making such a test." (*Bell* v. *Cons. Gas. Co.*, 36 App. Div. 242, 56 N. Y. Supp. 780; 6 Thompson on Negligence, sec. 7776.)

Assumption of risk is an affirmative defense, and we contend that it is not sufficiently alleged in either of the answers of appellants to raise an issue. It is not designated as an affirmative defense, and the attempted allegations thereof are in the form of conclusions, but assuming that this defense should be held to be sufficiently alleged to entitle appellants to urge it on this appeal, it was, under the evidence adduced, a question for the jury. (*Millen* v. *Pacific Bridge Co.*, 51 Or. 538, 95 Pac. 196; *Hartrich* v. *Hawes*, 202 Ill. 334, 67 N. E. 13; *Revolinski* v. *Adams Coal Co.*, 118 Wis. 324, 95 N. W. 122; *Anderson* v. *Illinois C. R. Co.*, 109 Iowa, 524, 80 N. W. 561; *Tuckett* v. *American Steam & Hand Laundry*, 30 Utah, 273, 116 Am. St. Rep. 832, 84 Pac. 500, 4 L. R. A., n. s., 990; *Rogers* v. *Roe & Conover*,

74 N. J. L. 615, 66 Atl. 408, 13 L. R. A., n. s., 691; *McGuire v. Waterloo Cedar Falls Union Mill Co.,* 137 Iowa, 447, 113 N. W. 850.)

It was proper to show by persons skilled in the particular line of work respondent was doing at the time of the injury, that the appliance furnished by appellant Copper Company was not a suitable or reasonably safe appliance. (*Anderson* v. *Fielding,* 92 Minn. 42, 104 Am. St. Rep. 665, 99 N. W. 357; *Wabash Screen Door Co.* v. *Black,* 126 Fed. 721, 61 C. C. A. 639; *Sibbert* v. *Scotland Cotton Mills,* 145 N. C. 308, 59 S. E. 79; *Chicago etc. R. Co.* v. *Rathneau,* 225 Ill. 278, 80 N. E. 119.)

Appellant assurance corporation was joined with appellant Copper Company, under section 6488 and section 5653 of the Revised Codes. The case of *Moore* v. *Los Angeles Iron & Steel Co.,* 89 Fed. 73, involved the construction of a statutory provision which is identical with the provisions of section 5653, *supra,* and it was there held that it "makes a policy of insurance against liability for personal injuries to employees inure directly to the benefit of the employee injured, and allows him to sue his employer and the insurance company jointly, if he so elects." The construction placed upon section 5653 in the *Northam Casualty Company Case* is not warranted either by the wording of the section or by the context or title of the chapter in which it appears. This section is found in the chapter dealing with indemnity in general. The first section of the chapter defines indemnity, and section 5650 deals with indemnity for past wrongful acts. Every section in this chapter deals with indemnity in general. If one who indemnifies a sheriff against damages for a wrongful seizure of property can, by statute, be held jointly liable with the sheriff to the person injured by the wrongful seizure, there seems to be no reason why one who indemnifies an employer against damages for personal injuries resulting from the employer's negligence could not be held jointly liable with the employer if the statutory provisions were broad enough to include that kind of indemnity. In one case the injury is the result of a wrongful act and in

the other. the result of a wrongful omission. There is very little difference in principle and effect. We submit that section 5653 is sufficiently broad to include employer's indemnity against damages for personal injuries sustained by employees. Where the intention of the legislature is obvious, there is no room for construction (*Smith* v. *Williams*, 2 Mont. 195); and "where its intention may be inferred from the plain meaning of the words of the statute, the court cannot go further and apply other means of interpretation." (*State* v. *Cudahy Packing Co.*, 33 Mont. 179, 114 Am. St. Rep. 804, 82 Pac. 833, 8 Ann. Cas. 717.)

The cases referred to by counsel as holding that an employer is prejudiced in an action for personal injuries by having brought to the attention of the jury that he is insured against damages for personal injuries, are brought under statutes different from ours, and therefore do not apply in this case.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This action was brought to recover damages for personal injuries alleged to have been suffered by plaintiff during the course of his employment, as a miner, by the defendant Reins Copper Company. This defendant is a Montana corporation. The other defendant is a corporation organized under the laws of Great Britain, with its principal office in the city of London, and is doing business in Montana. For convenience they are referred to hereafter, respectively, as the "Copper Company" and the "London Company."

It is alleged in the complaint, in substance, that on September 12, 1907, the plaintiff was in the employment of the defendant Copper Company in its mine in Silver Bow county; that in the prosecution of his work he was required to raise or hoist certain timbers from the first floor of the 800-foot level of the mine up to the eighth floor; that the defendant, in order to enable him to do this, furnished him a chute or slide and a rope with block and

pulley; that, the block and pulley being fastened immediately over the chute above the eighth floor, the rope was run through the same so that one end could be fastened to the timbers to be hoisted, while the other reached down to where the plaintiff stood below; that after the rope was fastened to the timbers they were raised by plaintiff by pulling upon the other end of the rope by hand; that the chute was wet by reason of water dripping up it from above; that it was unsafe, in that its sides were not of sufficient height to prevent the timbers from slipping out when they became loose while being hoisted; that the rope was unsafe and dangerous because it became stiff by reason of the wet condition of the chute, and therefore could not be properly fastened to the timbers so as to safely raise them from one floor to the other; and that the roof of the floor where plaintiff was required to stand was so low that in raising the timbers he was compelled to stand near the chute, and was thus unnecessarily exposed to danger of injury by the falling of any timber which became loose while being hoisted. It is alleged that by reason of the negligence of the defendant Copper Company in failing to provide reasonably safe appliances with which to work, and a reasonably safe place in which to be while at work, "one of said timbers, after being raised a considerable distance from said 800-foot level up along said slide or chute, became loose and was thrown and precipitated with great force and rapidity down the said slide or chute toward the plaintiff, and then and there, and without fault upon the part of plaintiff, struck him upon his back," etc., thus inflicting upon him permanent injuries. It is alleged, further, that on May 28, 1907, the defendant London Company, in consideration of certain premiums paid to it by the defendant Copper Company, agreed to insure and indemnify the latter against liability for damages for personal injuries accidentally suffered by any of its employees, or for death resulting therefrom, while it was engaged in mining or in any operations incidental thereto, during the year beginning on May 28, 1907, not to exceed in case of any one person the sum of $5,000. Judgment is demanded against the defendants

jointly for the sum of $5,000, and against the Copper Company for the additional sum of $10,000. The defendants demurred to the complaint jointly, both generally and also upon the ground that they were improperly joined in the action. The demurrer was overruled. The separate answers deny all the averments of fact furnishing any ground for inference of negligence on the part of the Copper Company, allege that plaintiff's injury was the result of his own negligence, and plead specially that the danger was obvious, and that plaintiff assumed the risk by remaining in the employment of the defendant Copper Company.

On the trial the only allegation of negligence on the part of the defendant Copper Company which plaintiff sought to establish was that it failed to furnish him a reasonably safe and suitable appliance for use in hoisting the timbers. The contention was that, inasmuch as during its use the rope became wet and stiff and could not be properly tied to secure the timber, it could not be safely used, and hence that the defendant should have furnished an iron or steel chain attachment which would not be affected by the wet. The court submitted the case to the jury upon the issues made as to this allegation only. A verdict was returned against both defendants for $5,000, and against the Copper Company for an additional sum of $2,000. The defendants have appealed separately from the judgment entered thereon and the order denying their motions for a new trial.

It is argued by respondent that the appeals may not be entertained: (1) Because, defendants having moved jointly for a new trial, they may not be heard upon separate appeals from the order denying their motion; (2) because, having failed to serve each other with notice of appeal, they cannot be heard upon the appeal either from the order or the judgment; and (3) because the transcript is insufficient to advise this court as to what matters were considered by the trial court in denying the motion for a new trial.

The assertion that defendants made a joint motion is based upon the course adopted by them in preparing it. They were represented by the same counsel. Their notice of intention re-

cites that the defendants (giving their names) "intend sep-
arately to move the court to set aside the verdict herein  *   *   *
and grant a new trial, upon the following grounds, to-wit."
Presumably to avoid expense, they prepared a single bill of ex-
ceptions bringing into the record all of the proceedings had
during the trial, showing the objections and exceptions of de-
fendants, both joint and separate. It was settled without ob-
jection by plaintiff. How the motions were submitted does not
appear. In disposing of them the court treated them as a single
joint motion, reciting in the order: "This day the defendants'
motion for a new trial  *   *   *  is  *  *   *  denied." We
do not think there is merit in any of these contentions. Though
the notices were incorporated in the same paper, they gave to
plaintiff all the information which the statute requires, to-wit,
that each defendant intended to move for a new trial, with a
statement of the grounds upon which it intended to rely. (Re-
vised Codes, sec. 6796.) It cannot be said that from such a
notice the plaintiff did not understand that he was required to
meet separate motions. (*Bathke* v. *Krassin*, 78 Minn. 272, 80
N. W. 950; Spelling on New Trial and Appellate Procedure, sec.
372.)

There is no rule of procedure which prevents two or more par-
ties from presenting a joint bill of exceptions. The purpose of
a bill of exceptions is to bring into the record matters occurring
during the trial, which would not otherwise be a part of it.
(*In re Dougherty's Estate*, 34 Mont. 336, 86 Pac. 38.) Such
being the case, the only obligation resting upon a party who in-
tends to rely upon it is to prepare and have it settled in pur-
suance of the provisions of the statute. If it speaks the truth
as to the matters upon which he purposes to rely, his right to
rely upon it is not impaired notwithstanding it may incorporate
matters that are immaterial to his case. The only interest the
adverse party has in it is that it speak the truth as to the matters
offered by the moving party in support of his motion. We think
the order of the court denying defendants' motions must be con-

strued in the light of the notice by which the proceedings were initiated.

Even if the defendants had moved jointly, either had a right to prosecute its appeal from the order denying their motion. The provision of the statute is: "A party aggrieved may appeal in the cases prescribed in this title." (Revised Codes, sec. 7079.) Among the appealable judgments and orders enumerated in the following section is "an order granting or refusing a new trial." If the contention of counsel should be sustained, the right to appeal in any case would be made to depend, not upon the statute, but upon the accident that the appealing party had been associated as plaintiff or defendant with another party, and the ability or disposition of such other party to prosecute his appeal.

Nor do we think that the right of defendants to be heard is impaired in any way by the fact that they did not serve their notices of appeal upon each other. The statute (Revised Codes, sec. 7100) requires the notice to be served on the adverse party or his attorney. The expression "adverse party" is held to include all parties who have an interest in opposing the object sought to be accomplished by the appeal. (*T. C. Power & Bro.* v. *Murphy,* 26 Mont. 387, 68 Pac. 411.) Here both parties are and were, during the trial and other proceedings in the district court, represented by the same counsel. To sustain the contention of counsel would exact the absurd requirement that an attorney, representing different parties, should, in order to make their respective appeals effective, serve upon himself, on behalf of each of his clients, copies of the notices which he himself had prepared for them. The purpose of the notice is to bring before the appellate court all the parties who have the right and may wish to oppose the contentions made by the appellant. Here neither of the defendants occupies a position adverse to its codefendant. The record shows that they assail the judgment upon the same grounds. Whether any of these grounds is available to both defendants or not is a question that may be examined only upon reaching the merits of the appeal.

In the notice of intention the plaintiff was informed that the motion would be made upon affidavits, a bill of exceptions, and the minutes of the court. Counsel contend that since no affidavits are found in the transcript, nor a statement of the case formally settled as the minutes of the court, this court cannot safely consider the merits of the appeals from the order, because it cannot know with certainty what the trial court considered in denying the motion. In the early case of *Gamer* v. *Glenn*, 8 Mont. 371, 20 Pac. 654, substantially the same contention made by counsel here was overruled. It was there held that though the notice stated that the motion would be made "upon the minutes of the court, the bill of exceptions now or hereafter on file in said cause, and a statement of the case hereafter to be prepared and served," no prejudice was done to the adverse party by the abandonment by the moving party of all save one of the proposed methods of presenting his motion. The bill of exceptions in the record before us is sufficient upon its face to inform this court of all the rulings of the court upon which the defendants rely, together with all the attendant incidents of the trial necessary to a full understanding of them. No fault can be found by the plaintiff because other grounds of the motion, the existence of which might have been shown to the trial court by affidavit, did not in fact exist, or, if they did, that they were not made to appear. The same may be said with reference to the omission of a statement of the case embodying the minutes of the court. The case of *Sanden* v. *Northern Pacific Ry. Co.*, 39 Mont. 209, 102 Pac. 145, cited by counsel, is not in point. In that case the appeal was from an order granting a new trial. It appeared that the application had been made upon the minutes of the court. It was held that though there was in the record a bill of exceptions, yet, since it did not appear that the order was based exclusively upon the matters shown by the bill and not in part at least upon the minutes of the court, the appellant had failed to show that the order was not warranted, and hence that it must be affirmed.

Passing now to the merits: The first contention made by the defendants is that the evidence is not sufficient to justify the verdict. The plaintiff was, at the time he entered the employment of the Copper Company, an experienced miner. He had been employed in various mines during the preceding nine years. To quote his own statement: "I am an all-around miner, having experience generally in the occupation of mining. As a general rule, I am familiar with the mode and system of carrying on that kind of work generally." He had been in the employment of the Copper Company about six months. About 2 o'clock on the day in question, and a few minutes before the time arrived for him to go off shift, he was at work on the ninth floor of the stope on the 800-foot level in the mine. The ground was heavy, and it was necessary to support it with timbers. As the timbers were needed, they were hoisted, one at a time, from the level through a chute constructed of inch boards, with sides about five inches high, extending from the level upward on an incline to the eighth floor of the stope. From there they were raised to the ninth floor by hand. The appliance used in hoisting was a three-quarter inch rope and pulley. The timbers used were about seven feet in length. On hoisting them, the loose end of the rope was fastened to a stick by a timber hitch let into a notch made at one end of the stick, and then passed along to within eighteen inches of the other end, where a half-hitch was taken. The stick was then drawn by hand, by the other end of the rope, by two or more men, along the chute until it reached the place above where it was needed. The plaintiff was directed by the foreman to go down to the level and send up a stick, in order to have it at hand to be placed in position by the next shift. Having secured one, he attached the rope to it in the usual way. Finding it too heavy for him to hoist alone, he called to his assistance the witness Raleigh, who was employed as a pumpman. When they were ready to hoist, plaintiff called to a miner above, by the name of Jeffrey, to help also. This he did by pulling on the rope. How the accident happened may be best gathered from the statements as made by the witnesses:

The plaintiff stated: "After getting the post into the chute, I put on a timber hitch. After I put the timber hitch on, I tried it, got it as tight as I could, put my foot against it, and then I put a half-hitch on the top, about eighteen inches from the upper end of it. * * * After Mr. Raleigh came to the chute we started to hoist the timber. I looked at the rope before we started to pull, and the hitches were on all right as far as I know. There was no slack between the half-hitch and the timber hitch. * * * The raise was wet; that is, the water wasn't pouring down, but it was dripping and was down on the hanging-wall. The bottom of the timber chute was wet. There was no other appliance for hoisting these timbers except the rope. * * * Before that time I had no experience in handling timbers in wet places in mines. That is the first wet mine I ever worked in in my life. * * * We were pulling hand over hand. I couldn't say how high we hoisted that timber, for I couldn't see, only judging from the rope coming down, it was, I should judge, about somewhere between thirty and forty feet; of course, I couldn't see it. When the timber was that high it came back, broke loose. It came back because it slipped out of the rope. It fell down the slide about thirty-five or forty feet. It came down the slide part way, and I suppose it came through the manway when it hit me. It was out of the slide when it reached the station, and in the manway. * * * The rope that I used for hoisting timbers I think was about an inch rope, when it was new. When I saw it, it had probably swelled to an inch and a quarter, or an inch and a half; I could not say, I never measured it. The swelling was caused by being wet and damp. The customary way to tie on a rope on a timber was with a timber hitch and a half-hitch. * * * That is exactly the way the timber was tied. * * * As to explaining to the jury how that timber could escape from the rope, I can't say how it did; but I know it did. That is the way I tied the rope. * * * I don't think that when a rope is wet it will tie tighter and adhere more firmly to a timber than when it is dry. I do not know and am not able to explain to the jury

what caused the timber to escape, only the rope slipped off. As far as I can tell, the rope was in good condition. The chute was in good condition, outside of being low on the side. * * * I put the rope on in the proper manner. I fastened it on tightly, put my foot against it. I put a timber hitch on it and pressed my foot on it, and afterward put on a half-hitch and tightened it up again with my foot, about eighteen inches from the top; so that in my judgment I made the timber absolutely secure in those hitches. So far as I know, that is the customary and usual manner to fasten such timbers. * * * It is not a fact that I nearly always tied the timbers just halfway up like that (illustrating). I don't recollect that I did do it that way. If I did, I might recollect. Maybe I did sometimes. I cannot swear to it. I would not say I did not. I could not say that frequently the timbers would come up to the place the other men were working in that manner, without being tied with a timber hitch around the notch and a half-hitch around the top. * * * I do not claim now that the timber hitch that I put on was not entirely tight and secure. I did not claim at the time I began this action that it was not fastened on securely and tightly. * * * I could not say for certain how many times I had fastened the rope on the timber at the bottom of this chute in the same place; seven, or eight, or maybe ten times. As I stated before, I had different parties pulling timbers at different times on different shifts, and part of the time my partner would go down and get the timber, and, as I have stated, they would do this most of the time. As far as I know, the officers of the company took all necessary care and precaution in the management of the property, outside of there wasn't a chain and hook or something of that kind to fasten the timber. I did not know at the time whether the chain is the proper thing. If I did I would not work with it. I do not know now, only what I heard since. I did not know at that time whether a chain is the necessary or proper appliance, or more proper than a rope. I don't know anything about whether a rope is proper

and usual and the customary appliance in this character of work.''

The witness Raleigh testified as follows: ''I saw Mr. Cummings on that day, particularly somewhere near 2 o'clock in the afternoon, on the 800-foot level of the Reins Copper Company. When I noticed him in particular, he came to get me to help him pull on a post of timber, and I left my station and went to help him. I went into the drift where they took the timber in to pull up the chute. I looked at the timber and how the rope was tied on. It was tied on with a timber hitch and a half-hitch. The timber hitch was tied at one end, and the half-hitch at the other; well, I would not say at the end; he tied the timber hitch on the lower end and the half-hitch somewhere near the three-quarters. I helped pull up timbers there a number of times. The rope was tied on very much the same as they always did. The rope they used there was always damp. * * * The rope was damp and stiff. * * * The next thing that happened, as near as I can remember, after the stick was up some thirty feet, Mr. Cummings got a jar in the ribs by the timber that we were pulling up the slide. * * * I was quite often around where he was working, but not very often—whenever he would come for me. It was a frequent occurrence for him to come and ask me to assist him in hauling the timber up the timber chute—any time they happened to want me. I have frequently helped Mr. Cummings to do the same work. * * * I don't know whether I can tie a timber hitch or not, but I think I can. * * * The rope was damp from moisture. In my judgment, it was tied securely on the timber. It looked safe to me, or I would not have been there. * * * I can't explain how it happened at all. All I know is that the timber came down. I could not state whether it came down the chute or whether it was on either side. I can't offer any explanation of the timber coming down there at all. * * * From anything I know, there was nothing to cause that timber to come down there. I don't know what would cause the timber to come down. * * * From the appearance

of things there, I considered it absolutely safe and secure in every way, and, if it had been otherwise, I would not assume the risk of being struck by falling timber. I had frequently hoisted timbers there on several occasions, assisting Mr. Cummings and other men hauling timbers there. * * * I don't know about the rope; it might have been changed, and I might not have noticed it. It was the same character of rope, strong and firm in appearance, and had no flaws in it that I seen. A rope is all they had there to pull timber up a slide, and as far as I know it was the customary thing used in other mines. * * * I never had any timber escape that way before when pulling it up the slide when tied in that condition. * * * No moisture on the rope or dampness interfered with the use of the rope at all. * * * My judgment would say that the wetness of the rope or the wetness of the slide had nothing to do with the cause of the accident."

The witness Koskela testified, in substance, that the appliance customarily used in the more important mines in Butte was a rope with a chain attachment for the purpose of fastening it to the timbers, especially in wet places, and that such an appliance is safer than a rope. He was allowed to testify, over the objection of defendants, that a rope is unsafe when wet, because it is slippery and will not fasten upon the timber properly, while a chain will fasten in the timber and cannot slip. Other witnesses testified to the effect that a rope is frequently used for the purpose of hoisting timbers and is usually the only appliance used in small mines such as that of the defendant Copper Company. No witness testified to an examination of the rope after the accident, to determine whether it became untied or merely slipped off the timber. It appears, however, that it was examined to ascertain whether it was broken.

Eliminating from this evidence the opinion expressed by the witness Koskela, to the effect that a rope without the chain attachment is unsafe—which was incompetent, as we shall hereafter show—it is wholly insufficient to make out a *prima facie* case of negligence on the part of the Copper Company. The

business of mining is accompanied by more or less hazard in all of its branches. While this is so, the rule of law by which the conduct of the employer toward his employees is governed is that of ordinary care; that is, such care as would be exercised by an ordinarily prudent man engaged in the same business. He must observe this rule in selecting the tools and appliances which he furnishes to his employees to be used in performing their work. When he has done so, he has fully discharged his duty in this behalf. He is not bound to furnish the best appliances, nor the safest, nor to provide the best method for their operation, in order to save himself from responsibility for accidents resulting from their use. If, at the time an appliance is selected, it is in general use and reasonably adapted to the purpose for which it is employed, the continuance of its use does not in itself indicate negligence, even though there may be safer devices used by others to accomplish the same purpose. (*Johnson* v. *Boston & Montana etc. Min. Co.*, 16 Mont. 164, 40 Pac. 298; *Mulligan* v. *Montana Union Ry. Co.*, 19 Mont. 135, 47 Pac. 795; *Kern* v. *De Castro etc. Co.*, 125 N. Y. 50, 25 N. E. 1071; *Sappinfield* v. *Main St. Ry. Co.*, 91 Cal. 48, 27 Pac. 590; *Lake Shore & Michigan-Southern Ry. Co.* v. *McCormick*, 74 Ind. 440; *Wonder* v. *Baltimore & Ohio Ry. Co.*, 32 Md. 411, 3 Am. Rep. 143; *Nutt* v. *Southern Pac. Ry. Co.*, 25 Or. 291, 35 Pac. 653; Woods on Master and Servant, sec. 331; Revised Codes, sec. 5244.) And when the appliance is not obviously dangerous, and has been proved by long use to be safe and efficient, its use may be continued without bringing upon the employer the imputation of negligence. (*Sappinfield* v. *Main St. Ry. Co.*, *supra*.)

In the first place, the evidence tends to show that the rope in question, or a similar one, had been in use by the employees of the defendant Copper Company for a long time, with perfect efficiency and safety; and that while, perhaps, it was not as well adapted for the accomplishment of the work for which it was used, as it would have been had it been fitted with an iron or steel attachment, it was not obviously dangerous. Tested by the

rule stated above, it is not sufficient to furnish an inference of negligence on the part of the Copper Company in the discharge of its duties to plaintiff. In the second place, it does not appear from what specific cause the timber became loose and fell. While it appears that the rope was stiffened by reason of its wet condition, yet the only legitimate inference to be drawn from the statements of plaintiff and his witness Raleigh is that this did not interfere with its use at all. Raleigh stated definitely that it did not, while both emphasized the fact that it was apparently safely secured before they began to hoist. They both avow their inability to explain how the accident occurred. The rope was not broken. The conviction is therefore inevitable, either that the timber escaped because the rope was not properly tied, or from some unknown cause. If we assume the first alternative, the plaintiff, who tied the rope, was negligent, and thus responsible for his own injury. If we assume the second, it does not appear who was to blame. In either case the plaintiff cannot recover. Again, if we assume that the rope without the chain attachment was unsafe, no liability is shown because the causal connection between the defect and the injury is not apparent. In view of the statements of the plaintiff and Raleigh, though the rope was stiff and hard to tie, yet this difficulty was overcome, so that, when the timber left the floor on its way up the chute, it was securely fastened. To hold the employer liable, it is necessary for the employee, not only to show that he was injured during the course of his employment, but also that his injury was proximately caused by the negligence of the employer. (*Monson* v. *La France Copper Co.*, 39 Mont. 50, 101 Pac. 243; *Olsen* v. *Montana Ore Pur. Co.*, 35 Mont. 400, 89 Pac. 731.) For aught that appears here, the accident would have happened notwithstanding the alleged defective character of the appliance.

On behalf of the London Company, the contention is made that it was improperly joined as defendant. The point was sought to be raised by demurrer, and also by a motion for a nonsuit. The demurrer was joint. Under section 6534, Revised Codes, the defect of misjoinder of parties defendant can be

raised only by special demurrer by the party improperly joined. This objection is not available to the defendant Copper Company, for it does not in any way affect its liability that another, who is not liable, was made defendant with it.  (6 Ency. of Pl. & Pr. 311.)   By joining in the demurrer with the defendant Copper Company, the London Company made common cause with it, and, since the court properly overruled the demurrer as to the Copper Company, it did not commit error in overruling it also as to the London Company.   (*Rand* v. *Butte Electric Ry. Co., ante,* p. 398, 107 Pac. 87; Bates' Pleading, Practice and Forms, 114.)

A separate motion for nonsuit made by this defendant was also overruled.   This ruling is not assigned as error, though a considerable portion of the brief is devoted to an argument to demonstrate that it was.   The question of the liability of this defendant, with the Copper Company jointly, is therefore not technically presented.   Nor is the question of the sufficiency of the evidence as to it presented, except as tending to show liability of the defendants generally.   However, since a new trial must be ordered, and since the question will again arise, we have concluded to state briefly our views with reference to it.

The contention at the trial was that, since this defendant had entered into a contract to indemnify the Copper Company against liability for damages such as are sought to be recovered in this action, it is liable jointly with the Copper Company, under the provisions of section 5653 of the Revised Codes.   This section reads as follows: "One who indemnifies another against an act to be done by the latter, is liable jointly with the person indemnified, and separately to every person injured by such act." The question is whether this section is only declaratory of the common-law rule, or whether it extends the rule so as to include the indemnitor who stands in the same relation to the indemnitee as does the London Company.   This relationship is founded upon the contract of indemnity, and unless the assumption of this relation put it in such a position, with reference to the Copper Company, that it became jointly liable with the latter for all

wrongs committed during the course of its business which fall within the purview of the contract, it cannot be held liable in this action.

If the London Company is liable to the plaintiff in this action at all, it is liable as a joint tort-feasor with the Copper Company, for the full amount of the damage sustained; for, if by virtue of its contract with the Copper Company it became a party to the wrong which the plaintiff alleges he suffered, its liability is not limited by the amount in which it agreed to re-imburse the Copper Company. If it is not to be regarded as a joint tort-feasor with the Copper Company, and therefore not liable to the same extent as the latter, then it is liable only upon the contract. For present purposes it makes no difference whether the plaintiff may, under any circumstances, sue it directly upon the contract as one made for his benefit. It is clear that upon principle he cannot pursue it in an action at law such as this, upon the contract and at the same time pursue the Copper Company for its tort. At common law the indemnitors of a sheriff were held liable with him when he had unlawfully seized or detained property at their instance; but this was because they had, in a legal sense, prompted his action, and therefore participated with him in the wrong as principals, and not because they were liable to the plaintiff on the contract of indemnity. The following cases illustrate the rule: *Herring* v. *Hoppock,* 15 N. Y. 409; *Fonda* v. *Van Horne,* 15 Wend. (N. Y.) 631, 30 Am. Dec. 77; *Davis* v. *Newkirk,* 5 Denio (N. Y.), 92; *Davidson* v. *Dallas,* 8 Cal. 227.

Section 6215 of the Revised Codes declares: "The provisions of this Code, so far as they are substantially the same as existing statutes, or the common law, must be construed as continuous thereof, and not as new enactments." In view of this provision, we must hold that section 5653, *supra,* does not change the rule recognized in the cases cited, unless the language employed in it impels to the contrary conclusion. The phrase, "an act to be done," with reference to which the indemnity exists, clearly implies an act the nature of which is known to

the parties, and one which is yet anticipated. It also strongly implies that the liability contemplated is to accrue from the doing of the act, and not upon the contract of indemnity. This view does no violence to the language employed; on the contrary, it seems to be the plain and obvious import of it. At the same time it renders unnecessary the conclusion that the legislature intended, in enacting it—not by express declarations, but by the barest implication—to abrogate a rule of law which is based upon a fundamental principle. In the case of *Moore* v. *Los Angeles Iron & Steel Co.* (C. C.), 89 Fed. 73, a contrary view is expressed; but the reasons assigned do not commend themselves to our judgment. In the case of *Northam* v. *Casualty Co.,* 177 Fed. 981, Judge Dietrich, of the United States district court for the district of Idaho, went at some length into the history of the statute, and reached a conclusion in accord with that expressed above. To us his reasoning seems unanswerable. The London Company was therefore improperly joined as a defendant, and the action should be dismissed as to it.

The ruling of the court in permitting the witness Koskela to express an opinion to the effect that a rope without a chain attachment is an unsafe appliance was error. The statute (Revised Codes, sec. 7887) provides that the opinion of a witness may be given upon "a question of science, art or trade, when he is skilled therein." The general rule, however, is that he may state facts only "whenever the question to be determined is the result of the common experience of all men of ordinary education, or is to be inferred from particular facts; the inference is to be drawn by the jury and not by the witness." (*Sappinfield* v. *Main St. Ry. Co., supra.*) In *Nutt* v. *Southern Pac. Ry. Co., supra,* in considering the admissibility of the same character of evidence, the court said: "The necessity for opinion evidence only exists where the facts in controversy are incapable of being detailed and described so as to give the jury an intelligible understanding concerning them; but when the facts are such as can be detailed or described, and the jury are able to understand

and draw a correct conclusion from them without such opinion evidence, the necessity for it does not exist." (See, also, *Metz* v. *City of Butte,* 27 Mont. 506, 71 Pac. 761.)

The judgment and order of the district court are reversed, and the cause is remanded, with direction to dismiss the action as to the London Company.

*Reversed and remanded.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.