SELLERS, APPELLANT, *v.* MONTANA–DAKOTA POWER CO., RESPONDENT.

(No. 7,318.)

(Submitted January 12, 1935. Decided February 5, 1935.)

[41 Pac. (2d) 44.]

*Messrs. Shank, Belt & Rode,* of the Bar of Seattle, Washington, *Mr. Desmond J. O'Neil, Mr. H. L. Maury* and *Mr. A. G. Shone,* for Appellant, submitted an original and a reply brief; *Mr. Maury* argued the cause orally.

42

43

*Messrs. Hildebrand & Warren* and *Messrs. Cobb, Hoke, Benson, Krause & Faegre,* of the Bar of Minneapolis, Minnesota,

44

for Respondent, submitted a brief; *Mr. Raymond Hildebrand* argued the cause orally.

46

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The plaintiff, Jessie Jean Sellers, has appealed from a judgment against her and in favor of the defendant, Montana-

Dakota Power Company, a corporation organized under the laws of Delaware and furnishing electricity and natural gas to the city of Glendive and its citizens.

The action arose out of the loss of plaintiff's household goods and personal property, located in an apartment rented by her on the second floor of the Reynolds building, in Glendive, when the building was destroyed by fire on the morning of November 20, 1932. This building consisted of a basement and first floor, occupied by Reynolds and a tenant in conducting· a store and meat market, and a second floor divided into ten living apartments, one of which was occupied by this plaintiff. In June, 1932, Reynolds purchased and installed a second-hand Frigidaire machine, the motor to which was placed in the basement and from which a conduit containing electric wires was extended up through the building to the meter closet on the second floor. This machine was defective, and Reynolds purchased a new motor, and later had the "electrical side" examined by an expert, and then the "chemical side" replenished and perhaps repaired. The fire was evidently caused by a short circuit in the "electrical side" of the Frigidaire. The plaintiff contends that this situation was brought about by the negligent acts or omissions of the defendant company.

The complaint alleges that a part of the business in which the defendant was engaged was "the installation of power and light connections, the installation of Frigidaire, ice making machines; the inspection of such connections of its electric currents, with motors and lighting devices used by its customers, * * * and the sale of natural gas under pressure through pipes to such of the general public in Glendive as desired to and did pay for its service and its commodity, natural gas. That plaintiff was one of its customers. * * * That at some time about five months before November 19, 1932, the proprietors of said building had in the basement thereof a Frigidaire machine which was not properly installed nor properly connected with the electric current * * * with defective insulated feed wires and unworkable and unsafe, * * *

and * * * for hire and for special payment therefor, requested the defendant to send some expert man to examine, inspect, repair and reconstruct the electric connections of said Frigidaire,'' and put it and its connections ''in good and safe condition,'' and that the defendant agreed to do so. Further, that the servant of the company worked on the machine several days, but failed to render the machine safe, though assuring the proprietors that he had done so, and that the defendant's negligence in this regard and in ''sending an excessive load of electricity over the same, set the building on fire.''

It is further alleged that the defendant negligently failed to install fuses which would break the current when the load became too heavy, and permitted switches to be ''bridged'' so that the fuses would not burn out if the Frigidaire received a greater load than it was designed for, all of which defendant knew from monthly inspections of the Frigidaire and its connections, or should have known by the exercise of reasonable care and ordinary skill, but nevertheless continued to send a ''large current of electricity'' over the wires. It is then alleged that the fire could, and would, have been extinguished without damage to plaintiff's property ''but for the continuing charge of an excessive current of electricity being sent through the said wires by the defendant''; that the fire would have been extinguished had the defendant used reasonable care and speed to cut the current from the building, ''but, being notified to do so, it negligently failed to cut off the said current,'' and failed to have on hand ladders and devices for doing this work. It is further alleged that escaping gas contributed to the fire and that the defendant failed and neglected to have stopcocks outside the building, which were workable, to cut off the gas.

However, the evidence adduced, and which the jury was permitted to consider, warranted a finding to the effect that the defendant installed wiring only on the outside of buildings, and did not, particularly with reference to the Reynolds building, have anything to do with the wiring within buildings; that the offending Frigidaire was installed in June, 1932, by an

independent electrician employed by Reynolds, who did all the work with the exception of the placing of the meter, and that all work thereafter done, and all inspection of the wiring thereof, was by this electrician, or another electrician also employed by Reynolds; that the man called in the latter part of the month to inspect and repair the Frigidaire, an employee of the defendant, was not an electrician and not authorized to inspect or do any work on the wiring, but was employed only to take care of the "chemical side" of the machine; that he did this; finding that the chemical was low and the pipes leaking, he repaired the pipes and renewed the liquid. For this service and liquid, the proprietor was billed, and this bill he paid, but the defendant was in nowise responsible for the condition of the wiring within the building, or the defects, if any, in the "electrical side" of the Frigidaire.

While a number of switches had been installed in the building, but one was "bridged" to prevent the safety fuses from burning out; the evidence does not disclose who was guilty of this breach of proper installation, nor whether it affected the Frigidaire wiring.

The volunteer fire department of Glendive was called out some time after the fire was discovered, and arrived at the building at 2:15 A. M.; it found such a volume of smoke in the basement that it was impossible to enter that part of the building. The conduit leading from the Frigidaire motor to the meter closet on the second floor was found to be at white heat, and this condition was not relieved by opening all the switches in the closet, nor did the flooding of the conduit and surroundings with both chemicals and water have any permanent effect upon the conduit. The fire itself was, at the time of the arrival of the fire department, and for perhaps an hour thereafter, insignificant, and could have been extinguished without damage to plaintiff's property had it not been for the presence of some strange and unusual condition unique in the experience of firemen of from eighteen to twenty-five years' experience. This condition, however, would not warrant

recovery unless it was shown to have resulted from some negligent act or omission of the defendant company.

The evidence adduced and permitted to go to the jury supports the judgment, and there is no contention that it is insufficient to warrant the verdict. Appellant's chief complaint is that the court erroneously excluded offered evidence, and struck out evidence after its admission, which tended to connect the defendant with the condition shown and demonstrate negligence on its part, asserted by appellant to have been the proximate cause of the fire and consequent damage to her.

Specifications 1 and 15 predicate error upon the rulings of ██ ██ the court in the following particulars: On redirect examination of the witness McDonough, who had been employed as an electrician by the proprietor of the building, counsel brought up the question as to the existence of "a ground of current," and the witness stated: "I don't know whether there was a ground of current in that building. It did not, to my knowledge, act like there was." Counsel then asked the question: "Did you answer, Mr. O'Neil, Saturday night, that it acted like there was a grounding of current there in the Reynolds Building at all times?" Objection was interposed on the ground that the testimony would be immaterial, that it was an attempt to impeach "his own witness," and as "improper cross-examination on any new matter." The objection was sustained, and counsel made an offer of proof, offering to show by the witness that for a period of eleven years there had existed, to the knowledge of the defendant, "a so-called ground of electric current" escaping from the station of the defendant and affecting every building located in six designated blocks in the city, which condition was of the utmost danger to the Reynolds building at the time the Frigidaire was installed and thereafter. In objecting to the offer, defendant's counsel added to the objections to the testimony above that the proposed proof was not within the issues framed by the pleadings. The objections to the offer were sustained. Later Electrician O'Malley, who was chief of the fire depart-

ment, testified to the existence of the "ground of current," but, without striking out the answers made, the court finally sustained an objection to that line of testimony. Thereupon the plaintiff tendered a somewhat lengthy amendment to the complaint, alleging the existence of a "condition known as a ground of current, escaping from defendant's generating plant, going into the ground and arising into every building" in six city blocks; that this condition rendered it impossible for any electrician to wire any of the buildings so that they would be safe, and setting up the manner in which, in the opinion of the plaintiff, the condition would render the wiring and piping of the building unsafe; that the condition was known to the defendant and was a contributing cause of the overheating of the conduit. The plaintiff asked leave to make the amendment, stating that she was entitled to go to the jury "on all the theories that our evidence sustains." Objection was made on the ground that the request was untimely, and that the complaint already contained allegations of every conceivable specification of neglect; that the amendment was irrelevant and constituted redundant and sham matter, and stated no actionable negligence. The objections were sustained, and the plaintiff was denied leave to amend.

The record does not disclose that the plaintiff or her counsel had any knowledge of the claim that the "ground of current" existed prior to the statement made by the witnesses on the stand, nor does it disclose that the alleged facts were not known to them at the time the original complaint was drafted; in other words, the record is silent as to the entire matter in so far as the trial is concerned. On motion for a new trial on the ground, among others, of newly discovered evidence, O'Malley's affidavit and that of the plaintiff and her counsel were filed, showing that O'Malley did not disclose the alleged facts until four days before the beginning of the trial, and a counter-affidavit by the manager of the defendant company indicates that O'Malley talked the matter over with him at about the same time that he did with counsel for the plaintiff. The

motion for new trial was denied, but error is not specified on this ruling of the court.

It is clear from the record that there was no basis for the above offer of proof at the time it was made; the witness then on the stand had stated that he did not know that the condition described in the offer existed in the Reynolds building, and had indicated that he did not think that it did.

An offer of proof is not sufficient without an affirmative showing of good faith and means of "doing or trying to do what is desired." (*State* v. *Bowser,* 21 Mont. 133, 53 Pac. 179, 182; *Schilling* v. *Curran,* 30 Mont. 370, 76 Pac. 998; *Juby* v. *Craddock,* 56 Mont. 556, 185 Pac. 771.) Had the offer been made while O'Malley was on the stand, error could not be predicated on its exclusion, as the proposed evidence was clearly not within the issues presented by plaintiff's charges of negligence in the installation of the wiring for the Frigidaire and the transmission of an excessive load over the defective wiring.

Having failed to get the evidence of the alleged "ground of ██ ██ current" in under the allegations of the sending of an excessive load "over said wires" or "through said wires," plaintiff sought to amend by alleging that vagrant or escaped electricity had entered the building through the ground and without the aid of wires. The motion to amend came after two days of trial and more than six months after the filing of the complaint, and would have changed the whole theory of negligence on which the action was based; no excuse was offered for failure to have this matter included in the original complaint or for not having sooner moved for leave to amend.

The district court is expressly authorized "in furtherance of justice," but "in its discretion," to allow an amendment to any pleading on such terms as it may deem just. (Sec. 9187, Rev. Codes 1921.) The statute is broad enough to permit an amendment at any time during the trial, or at the close of trial, to make the pleading conform to the proof, but the matter lies within the sound legal discretion of the trial court, and before this court may hold a refusal of leave to amend

to have been error, the appellant must show an abuse of such discretion. (*Cullen* v. *Western M. & W. Title Co.*, 47 Mont. 513, 134 Pac. 302; *Greene* v. *Rowan*, 29 Mont. 263, 74 Pac. 456.) In the circumstances here surrounding the motion to amend, it cannot be said that the court abused its discretion in denying the motion. (*St. George* v. *Boucher*, 84 Mont. 158, 274 Pac. 489.)

Among the many charges of negligence, the plaintiff alleged that the defendant failed to provide switches or other means of cutting off the current of electricity outside the building, and failed to use reasonable care and speed in cutting the current after being notified to do so. Further, that, by ordinance, the defendant was required to install workable stopcocks in the gas feed pipes outside the building, but had negligently failed to do so. It is further alleged that, for a considerable period after the fire was known to exist, it could have been readily extinguished without damage to plaintiff's property, except for the excessive load of electricity continually coming over the wires.

In an attempt to show that the above alleged negligence constituted a proximate cause of the damage and injury, plaintiff sought to prove by a member of the Glendive fire department, a volunteer organization to which he had belonged for nineteen years, and during which period he had attended practically every fire started in the city, that, with the equipment and water pressure present at the fire and the same fire force, the last three fires had been successfully extinguished after they had gained greater headway than the instant fire, and that this fire could have been put out within forty-five minutes after the department arrived, without damage to plaintiff's property, "if some strange substance had not been affecting the flames." Plaintiff further attempted to prove by the chief of the fire department, who had twenty-five years' experience fighting fires, that, had the gas been cut off from the building at 2:45 A. M., when an employee of the defendant unsuccessfully attempted to cut it off, the fire could have been confined to the basement, without damage to plain-

tiff's property. This testimony, with offers of proof thereon, was excluded.

It is now contended that the testimony of the first witness was incompetent, as all of the facts concerning the fire were before the jury, and that, as to the second, the offer contained a "hypothesis having no foundation in the evidence," to wit, that an employee of the defendant was on the ground at 2:45 A. M., and finally that neither witness was competent to testify as an expert.

As purveyors of such potentially dangerous commodities as electricity and gas, the defendant should maintain a department wherein men are subject to call at any hour of the day or night to meet an emergency, but no duty rested upon it to have a man on hand to cut off the electricity in every instance of fire. "The utmost that will be exacted of lighting companies in this regard is that they shall hold themselves in readiness to cut off the electricity when the necessity arises and they are informed of it by proper authority." (*Pennebaker* v. *San Joaquin L. & P. Co.*, 158 Cal. 579, 112 Pac. 459, 461, 139 Am. St. Rep. 202, 31 L. R. A. (n. s.) 1099.) There is evidence in the record that the defendant met the above requirements, and that, on request, the electric supply wires were cut, but the "unusual" condition referred to may have been due to escaping gas, and the excluded testimony did not refer to electricity.

With all the facts before the jury, expert opinion evidence is admissible when it is not possible for the jury to form its own conclusions from the testimony. (*Cummings* v. *Reins Copper Co.*, 40 Mont. 599, 107 Pac. 904; *Yergy* v. *Helena L. & Ry. Co.*, 39 Mont. 213, 102 Pac. 310, 18 Ann. Cas. 1201.) O'Malley, the fire chief, testified that Bentik, who was the defendant's gas service man, "was there by 2:45, that was the time I saw him with these tools"—the time when he was trying to shut off the gas. Each of the questions above should therefore have been answered, providing the witnesses were competent to testify as experts. Similar inquiries of "skilled firemen" are held to be proper. (*First National Bank* v. *Fire*

*Assn.*, 33 Or. 172, 50 Pac. 568, 53 Pac. 8; *Walker* v. *State*, 58 Ala. 393.) But counsel for defendant assert that, because these men were members of a volunteer fire department, one being an electrician and the other a transfer man, they do not come within the term "skilled firemen." It is not the manner in which a man secures his employment, but the nature of his employment and his experience which determine whether or not he is a competent expert witness. A man employed as a volunteer fireman for a period of eighteen to twenty-five years, and attending all fires in the city, secures the same experience in fighting fires as would a paid fireman serving for the same period. "It frequently happens that a witness, by reason of his special skill or experience along certain lines, is able to estimate more correctly than it would be possible for the jury to do, the cause of an observed phenomenon, or the effect of a particular occurrence, and under these circumstances the witness is permitted to state his inference." (22 C. J. 647.)

The court erred in excluding the testimony of the experienced firemen on the ground that their testimony was "incompetent."

The defendant, however, contends that the record discloses no evidence of gas escaping in the building prior to its collapse, and, consequently, that the evidence was incompetent.

These expert witnesses were present striving to extinguish the fire; the first was of the opinion that this could have been easily accomplished had it not been for the presence "of some strange substance"; and the second spoke as from knowledge that gas was escaping. Their credibility and the weight to be given to their testimony, had the testimony been admitted, would have been the subject of cross-examination and contradictory testimony. In this connection, one Atwood testified that, before the fire had gained any headway in the residence portion of the building, he went with his brother, since deceased, to his brother's apartment, and there noticed a peculiar odor to the smoke in the building, and stated to his brother that it was "the queerest smelling smoke I ever smelled," to which his brother replied that it was gas. This

testimony was admitted over the objection that it was hearsay and on the assertion that it was a part of the *res gestae*. However, at the close of plaintiff's case, the court ordered this testimony stricken; error is specified on this action of the court.

Section 10511, Revised Codes of 1921, declares that "where, also, the declaration, act, or omission forms part of a transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act, or omission is evidence, as part of the transaction." This section states one of the exceptions to the rule excluding hearsay testimony. "The principle upon which the exception is founded is that the declarations were made while the mind of the speaker was laboring under the excitement aroused by the incident, before there was time to reflect and fabricate, and hence the solemnity of the oath is not necessary to give it probative value." (*Callahan* v. *Chicago etc. Ry. Co.*, 47 Mont. 401, 133 Pac. 687, 689, 47 L. R. A. (n. s.) 587. See, also, *State* v. *Tighe*, 27 Mont. 327, 71 Pac. 3; *State* v. *Biggerstaff*, 17 Mont. 510, 43 Pac. 709; *Sullivan* v. *Metropolitan Life Ins. Co.*, 96 Mont. 254, 29 Pac. (2d) 1046.) The testimony should not have been stricken.

Negligence is predicated upon the manner in which the ▇▇▇ Frigidaire was repaired by an employee of the defendant company. While it appears from the evidence that this employee had nothing to do with the "electrical side" of the machine, it is shown that he did make repairs on the "chemical side" by renewing the fluid which had leaked out, and, according to his own testimony, by repairing the pipes through which the fluid had escaped. An expert in connection with Frigidaire machines voiced the opinion that the overheating of the "electrical side" and consequent fire was due to the failure properly to repair the "chemical side" of the Frigidaire. This witness stated that, "when the man replaced the fluid in the motor, he didn't fix the leak; * * * the solution gradually leaked out again, and it came to the point on the night of the fire where the motor stopped again." This testimony was stricken on motion.

Perhaps it should have been made more clear that this statement was the expert opinion or theory of the expert, rather than his statement of a fact, but as an expert opinion, based on conditions shown to have existed, it was admissible. As a part of the foundation for the expression of the above opinion, the expert was shown the cable which had connected the motor with the switch-box and which had been at white heat when the fire department arrived, which fact, with others, was called to the attention of the witness, and he was asked, "What, if any, evidence can you see on Exhibit 1 which would necessarily result from a shortage of liquid in the Frigidaire?" His answer was, "It is very apparent that there was a short circuit in the wires that burned that through. It sealed the wire. It is an electric weld. No building is hot enough to burn that. That is an apparent electric weld, caused by a short circuit in the wire." This evidence was stricken as a "conclusion of the witness." Of course, it was a conclusion, but it was one which, under the rules above announced, an expert electrician was entitled to voice; the jurors would manifestly be unable to draw their own conclusions from the mere facts and an inspection of the exhibit. The court, therefore, erred in striking the testimony.

The remaining specifications of error have been examined and found without merit.

For the manifest errors reviewed above, the judgment is reversed and the cause remanded for a new trial.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICE ANDERSON, concur.

MR. JUSTICE STEWART, deeming himself disqualified, and MR. JUSTICE MORRIS, absent on account of illness, take no part in the foregoing decision.

Rehearing denied February 27, 1935.